969 So.2d 83 (2007)
Shelton WILDER, Appellant,
v.
BOARD OF TRUSTEES OF the HAZLEHURST CITY SCHOOL DISTRICT, Appellee.
No. 2006-CC-00048-COA.
Court of Appeals of Mississippi.
April 24, 2007.
Rehearing Denied September 4, 2007.
*85 Thandi Wade, attorney for appellant.
Nathaniel A. Armistad, attorney for appellee.
Before LEE, P.J., BARNES and ISHEE, JJ.
LEE, P.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. Shelton Wilder appeals the decision of the Hazlehurst City School Board dismissing him from his position as superintendent of the Hazlehurst City School District.
¶ 2. Wilder became superintendent of the Hazlehurst City School District on July 1, 2003. After his first year of employment, his employment contract was renewed by the Board on August 11, 2004, after several revisions. This revised contract was signed by the Board on September 7 and was signed by Wilder on September 17. Although Wilder signed the revised contract, he made a note under his signature and attached an affidavit stating that he was signing the contract "under protest, without prejudice and with reservation of all rights." The note and affidavit both stated:
Signed under protest in that I disagree as to the modification of Employment Contract dated February 9, 2004, specifically to the provision of the DistrictWide Curriculum and Instruction clause, which reads as follows:
"Such supplement shall be approved by the Board annually. In the event the Board hires an employee to perform duties relating to district wide Curriculum and Instruction, the supplement will automatically cease effective the hiring date."
I did not assent to this provision being placed in the August 11, 2004 revised contract tendered to me by the Board on September 7, 2004, and I reserve the right to protest this element of the contract.
The supplement referenced was the $20,000 a year for curriculum and instruction director. His salary as Superintendent was $75,000 per year with a $500 monthly housing allowance. His base salary of $75,000 was later increased to $81,000 due to an eight percent increase given across the board to certain employees.
¶ 3. On September 20, 2004, the Board voted to dismiss Wilder from his duties as superintendent. The Board cited the following reasons for Wilder's dismissal:
1. Neglect of duty
a. Excessive absence from the office
b. Failure to address the needs of staff members as well as principals and other individuals he has been employed to supervise
c. Failure to maintain open lines of communication and failure to make himself available to the needs of the administrative staff
d. Failure to communicate with the Board effectively resulting in an ineffective working relationship and loss of confidence by the Board in Wilder's ability to be an effective superintendent
2. Insubordination

*86 a. Refused to comply with actions voted on by the Board and reflected in the minutes
b. Refused to maintain an open line of communication with the Board president after numerous requests by the president and other members of the Board
c. Refused to adhere to requests made by the Board and consistently threatened the Board with lawsuits
3. Abuse of Discretion
a. Consistently challenged employees in the district's administrative office to take actions that are in direct contradiction to actions taken by the Board
b. Consistently interfered with school officials including but not limited to principals, coaches, and teachers in their efforts to perform their duties
4. Failure to adhere to and comply with Board policy
a. Allowed various individuals to address the Board without advising of the nature of their communications as outlined in Board policy
b. Refused to work with the Board president, after numerous requests, to create an agenda that would work to facilitate the needs of the district.
¶ 4. A public hearing, requested by Wilder, was held before the Board on November 10, 2004, pursuant to Mississippi Code Annotated Section 37-9-111(1) (Rev.2001). On January 28, 2005, the Board voted four to one to uphold the dismissal. Wilder subsequently appealed the decision of the Board to the Chancery Court of Copiah County. The chancery court affirmed the dismissal on December 8, 2005, holding that the culmination of issues listed by the Board, excluding the charge of excessive absences, was sufficient to justify Wilder's termination.
¶ 5. Wilder now appeals to this Court asserting the following issues: (1) his statutory and constitutional rights were violated when he was not provided a list of witnesses, documents, and a summary of the testimony fourteen days before the hearing; (2) the chancellor erred in finding that the decision of the school board was not arbitrary and/or capricious; (3) the chancellor erred in finding that the majority of the board members did not possess a personal or financial stake in the outcome of his termination and that this did not affect their decision to terminate him; (4) the chancellor erred in finding that the majority of the board members did not have personal animosity toward Wilder; and (5) the chancellor erred in finding that the decision of the school board was based on substantial evidence.
¶ 6. Finding no error, we affirm.

STANDARD OF REVIEW
¶ 7. Dismissal of certificated school employees is governed by Mississippi Code Annotated Section 37-9-59 (Rev.2001), which provides good cause reasons for dismissal as well as the right to a public hearing. Crockett v. Bd. of Trs. for the Mound Bayou Sch., 770 So.2d 1030, 1032(¶ 5) (Miss.Ct.App.2000). If the school board has determined that the termination was proper following a public hearing, the school employee may appeal the decision to the appropriate chancery court. Miss. Code Ann. § 37-9-113 (Rev.2001); Crockett, 770 So.2d at 1033. The standard of review of a final decision of a school board is as follows:
The scope of review of the chancery court in such cases shall be limited to a review of the record made before the school board or hearing officer to determine if the action of the school board is unlawful for the reason that it was:

*87 (a) Not supported by any substantial evidence;
(b) Arbitrary or capricious; or
(c) In violation of some statutory or constitutional right of the employee.
Miss.Code Ann. § 37-9-113(4). Upon appeal of the chancellor's decision, this Court applies the same standard of review. Harris v. Canton Separate Pub. Sch. Bd. of Educ., 655 So.2d 898, 901 (Miss.1995).
¶ 8. In considering due process claims by employees appealing terminations, there is a "presumption of honesty and integrity" in board members serving as adjudicators in conducting hearings and rendering decisions on employee dismissals. Id. (citing Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). In order to rebut this presumption, the dismissed employee must show that the board members had a personal or financial stake in the decision, or that there was some personal animosity toward him. Id.

DISCUSSION
I. SHOULD WILDER HAVE BEEN PROVIDED A LIST OF WITNESSES, DOCUMENTS, AND A SUMMARY OF THE TESTIMONY FOURTEEN DAYS BEFORE THE HEARING?
¶ 9. Wilder argues that he was denied minimal due process because he was not provided a list of witnesses, documents, and a summary of the testimony within fourteen days of the hearing pursuant to Mississippi Code Annotated Sections 37-9-59, 37-9-109, and 37-9-111 (Rev.2001). He asserts that he complied with these provisions by providing information to the Board within five days of the hearing.
¶ 10. Wilder's argument that notice should have been given to him at least fourteen days prior to the hearing pursuant to Section 37-9-109 fails since this action is not governed by Section 37-9-109. This action is a dismissal which is governed by Section 37-9-59. The statute that Wilder argues notice is required under, Section 37-9-109, governs nonrenewals. It provides in pertinent part:
An employee who has received notice under Section 37-9-105, upon written request from the employee received by the district within ten days of receipt of the notice by employee, shall be entitled to: (a) Written notice of the specific reasons for non-employment, together with a summary of the factual basis therefor, a list of witnesses and a copy of documentary evidence substantiating the reasons intended to be presented at the hearing, which notice shall be given at least fourteen (14) days prior to any hearing. . . .
Miss.Code Ann. § 37-9-109. The case sub judice is not a nonrenewal action; it is a dismissal action, and, therefore, the preceding section is inapplicable. The letter signed by the Board president and hand delivered to Wilder on September 20, 2004, begins by stating, "Pursuant to the provisions of Miss.Code Ann. § 37-9-59, you are hereby notified that you are being dismissed. . . ." The letter continues that Wilder must respond within five days and that the procedure for his hearing "shall be as prescribed in Miss.Code Ann. § 37-9-111."
¶ 11. Wilder argues that this Court should apply the reasoning set out in the dissenting opinion in Rivers v. Bd. of Trs., 876 So.2d 1043 (Miss.Ct.App.2004) (Griffis, J., dissenting), to his case. The Rivers dissent offers the following analysis in applying Section 39-9-109 to dismissal cases as well as renewal cases:
Section 37-9-59 allows the board to dismiss Rivers for cause, after a hearing is held in accordance with Section 37-9-111. *88 Section 37-9-111 sets forth how the hearing will be held, including the procedure to be followed. Section 37-9-111(6) provides that Section 37-9-109 is one of the procedural rules that apply to the hearing. Section 37-9-109 provides that Rivers is entitled to certain information prior to the hearing.
Rivers, 876 So.2d at 1054(¶ 48) (footnote omitted). We do not follow this analysis of Section 37-9-109, entitled "Rights of employee receiving notice of nonrenewal generally; request for hearing; finality of decision." The majority's analysis in Rivers follows the statutory language as it is written. As the majority in Rivers summarized, "[i]f the employee avails himself of the option of a hearing, Section 37-9-59 provides that such hearing shall be as prescribed in Section 37-9-111 of the Mississippi Code. However, actions involving non-renewal, under Section 37-9-109, do not specifically reference Section 37-9-59." Id. at 1048(¶ 13). The applicable sections in this case are 37-9-59 and 37-9-111. We find that the Board complied with these sections.
¶ 12. Even if we found Section 37-9-109 applicable, Wilder himself failed to comply with its provisions, thus, again, making his argument invalid. Wilder failed to make a written request for applicable material as required by this section, and he failed to provide the Board with a response to the charges, a list of his witnesses, and documentary evidence as required by Section 37-9-109(d).
¶ 13. Wilder's assertion that his statutory and constitutional rights were violated is without merit.
II. DID THE CHANCELLOR ERR IN FINDING THAT THE DECISION OF THE SCHOOL BOARD WAS NOT ARBITRARY AND/OR CAPRICIOUS?
¶ 14. While the Board is charged with the obligation of fact finding, we are authorized to reverse a decision of the Board where there is insufficient evidence to support its conclusion or where we determine that the Board acted in an arbitrary and capricious manner. Harris, 655 So.2d at 901. The Mississippi Supreme Court has defined arbitrary and capricious as follows:
An act is arbitrary when it is not done according to reason or judgment, but depending on the will alone. `Capricious' [is] defined as any act done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.
Crockett, 770 So.2d at 1037(¶ 28) (citing Burks v. Amite County Sch. Dist., 708 So.2d 1366, 1370(¶ 14) (Miss.1998)).
¶ 15. Wilder argues that his dismissal was arbitrary and capricious because the Board acted out of haste and on will alone because they were angry that Wilder signed the revised contract under protest. He argues that he was not given a negative evaluation nor was he reprimanded verbally or in writing. Wilder points out that the elementary school rose from a level two to a level four school during his tenure. To find that the chancellor erred on this issue in affirming Wilder's dismissal, we must find that the Board acted without reason or judgment and with a lack of understanding or disregard for the surrounding facts. Id. For clarity, the main issues of contention between the Board and Wilder have been divided into six subsections.
Wilder's Employment Contract
¶ 16. Wilder contends that the Board acted "on will alone" in terminating him because they were angry that he signed the revised contract under protest. Wilder asserts that the Board showed arbitrariness by voting to dismiss him within *89 a matter of hours after he signed the contract under protest. Upon comparison, the revised contract was basically the same as the original, but Wilder stated he signed it under protest to reserve his rights under the contract. The only change was to his salary which the Board had reserved the right to change in the contract itself. His base salary was actually increased due to an eight percent increase across the board. The only portion Wilder objected to was the sentence making the compensation for curriculum and instruction director discretionary. After he signed the contract under protest, the Board had a closed session meeting and voted to terminate Wilder. This occurred on September 17, 2004.
¶ 17. Wilder argues that when the Board presented him with the revised contract on September 7, 2004, the Board offering him the contract wiped out or ratified any of his actions prior to that date. The dissent, which bases its opinion on this argument, states that "by signing the contract, the parties intended to proceed with the understanding that Wilder would be judged, evaluated, and dismissed, if appropriate, on the basis of actions or inactions occurring after the execution of the contract." However, this argument is without merit as precedent clearly shows that the foundation for dismissals generally accrues over a long period of time, and "actions occurring in a previous contract period are admissible at hearings and may serve as a part of the foundation for an employee's dismissal." Crockett, 770 So.2d at 1037(¶ 28); Merchant v. Bd. of Trs. of the Pearl Mun. Sep. Sch. Dist., 492 So.2d 959, 964 (Miss.1986); Jackson v. Hazlehurst Mun. Sep. Sch. Dist., 427 So.2d 134, 136 (Miss.1983).
¶ 18. The testimony presented showed that when the Board met to vote on Wilder's termination, they were tired of the conflict with the contract, and it was "about time to do something." The evidence does not show that Wilder was terminated because he signed the contract under protest; rather, the evidence shows that the Board made a decision based on continuous problems with Wilder, one being the contract. The contract is not mentioned in the termination letter nor in the Board's final decision as a reason for Wilder's termination.
Breakdown in Communication
¶ 19. The Board's main contention at the hearing was the breakdown in communication between Wilder and district personnel. Henry Dorsey, the high school principal, testified that he had problems getting items on the Board agenda due to Wilder's actions which affected his ability to do his job. For example, Wilder's lack of communication as to why the hiring of coaches and tutors was never put on the agenda caused delays in placing staff. Basically, the matters put on the agenda were at the sole discretion of Wilder. Dorsey and others testified that Wilder did not provide a cell phone or home phone number and that the only way to get in touch with him was through his assistant which usually proved to be fruitless as Wilder did not return their calls. Wilder countered this by stating that while he had a cell phone it was handed down to him from the previous superintendent, and he did not know the number. Wilder would tell those who asked for his cell phone number to contact his secretary; it is not clear in the testimony why the number was never given to those who requested it. According to the testimony of the district's business manager, since Wilder has left office communication has improved and all administrators are accessible by cell phone.
¶ 20. Another concern was that Wilder ignored or circumvented Principal Dorsey's *90 authority by pulling students out of class to give them "pep talks" before athletic events and sending letters to the coaches telling them that "optimal performance" was expected of the teams and that each sports program would be accountable for its performance. The Board alleges that the pep talks would often go on during school hours and would last up to an hour. A letter from Wilder questioned the play calls and caliber of play and implied that there would be consequences if play were not improved. The principal and coaches felt that this usurped their power to do their jobs while they were still being held accountable for the results.
¶ 21. Testimony was also given that Wilder told the teachers at the beginning of the year that the principals were to rehire all current teachers the next year. The principals felt this impeded their job of insuring quality teachers. When the principals tried to meet with Wilder, he told them he had a prior commitment and sent them a "to do" list which they took as retaliation for requesting a meeting. Wilder countered that the list was standard as it was beginning of the school year.
Withholding Test Scores
¶ 22. The Board complained that Wilder withheld certain test scores after they were released, and that before Wilder released the scores to the Board, the scores were released to the media. Wilder countered this by testifying that the state superintendent placed a moratorium on issuing testing data, and he was instructed not to release the scores until they were finalized. Wilder testified that the moratorium was not lifted off the superintendent until after the preliminary report was released to the media.
Failure to Meet Needs of Staff Members
¶ 23. Another complaint against Wilder was that he failed to meet the needs of staff members. One particular employee made several requests in writing for a new chair because of a back injury. Wilder denied her request for approximately five months from the date of her oral request and approximately two weeks from her first written request. When he denied the purchase, he told her she could address the Board about the chair. The Board approved the purchase of a new chair. Wilder testified that he denied the request because he had to be careful in expending federal funds, and he had to investigate the matter further since it was a "gray area." He did not want to set a precedent for accommodating employees with injuries received away from work, and, as the purchasing agent for the school district, he would be liable for unnecessary purchases. Another example given was an employees' travel request that was not promptly approved after several requests and memos.
Falsifying Information to the Board
¶ 24. Another contention with Wilder was that he knowingly manipulated salary figures and presented false numbers to the Board regarding a teacher's supplement. The supplement was approved and was not corrected until two members of the Board refused to sign the final submission form. Once when a Board member refused to sign a document that had an amount that was different than the amount approved on the agenda, Wilder yelled at her, telling her she should find a job elsewhere because she was not a team player. Wilder also, according to the Board, once gave false information in an attempt to have an employee's suspension lifted after inappropriate conduct at a high school football game. Wilder contends that he never knowingly submitted false information to the Board.
Excessive Absence
¶ 25. Finally, the Board asserts Wilder was excessively absent from the office. *91 Conflicting testimony was presented regarding Wilder's work hours and absences. The Board president testified that he and other staff members tried on numerous occasions to meet with Wilder to no avail. Nikki Holloway, an employee who admitted it was not her responsibility to keep track of Wilder's schedule, testified that he would come in to work late and only worked around twenty hours a week. This testimony is not sufficient to find that Wilder neglected his duties as superintendent. Wilder acknowledged in his testimony that he was often not in his office because his work method was "management by walking around." We acknowledge that it is possible that Wilder had legitimate business duties that kept him away from the office during the day. In fact, Wilder's administrative assistant testified that Wilder did visit the school campuses and attend meetings during the day. We find this argument to be without merit and merely an attempt to mount charges on Wilder.
¶ 26. Given the issues brought before the Board, we cannot find that the Board acted in an arbitrary or capricious manner. We find that substantial evidence existed to hold that Wilder's dismissal was not arbitrary or capricious. We agree with the chancellor that any of these grounds alone may not have provided cause for dismissal, but taking all the evidence and testimony together, problems existed at all levels between Wilder, the teachers, the Board, and the school personnel. The continuing conflicts discussed, excluding the charge of excessive absence from the office, are enough for this Court to find substantial evidence to support the Board's conclusions.
III. DID THE CHANCELLOR ERR IN FINDING THAT THE MAJORITY OF THE BOARD MEMBERS DID NOT POSSESS A PERSONAL OR FINANCIAL STAKE IN THE OUTCOME OF WILDER'S TERMINATION, AND THAT THIS DID NOT AFFECT THEIR DECISION TO TERMINATE HIM?
¶ 27. Wilder alleges that three Board members, a majority of the Board, had something to gain by his dismissal, and, therefore, he was denied an impartial tribunal.
¶ 28. Wilder testified that Board member Bettie McDaniel lost money when the school progressed. She was not called as a witness to rebut this allegation. McDaniel held a summer school remediation program but, according to Wilder, as the school improved under his leadership there were fewer students who needed the program. Wilder also testified that she interrupted classes and testing to disrupt the children. He also testified that she would request personal information about him from the central office without authority. The assertion that McDaniel wanted children to do poorly at school so they would enroll in her remediation program is completely unfounded speculation by Wilder. As a Board member, McDaniel should have had the best interest of the students in mind and no evidence was presented to show that she did not.
¶ 29. Wilder argues that R.T. Stanton, another Board member, had a personal stake in Wilder's job because he wanted Dorsey to be superintendent and would do whatever he could to effectuate that. Wilder further argues that because Stanton wanted Dorsey to be superintendent, Stanton could not be fair and impartial at the hearing. He also asserts that Stanton developed a personal vendetta against Wilder because Wilder refused to allow Stanton's personnel recommendations to be placed on the agenda. Wilder testified that Board member Jesse Jones also had a personal and financial stake in Wilder's *92 termination. Jones was not called to testify. Wilder argues that Jones wanted Dorsey to be superintendent. According to Wilder, Jones began requesting personal information about Wilder from the central office without authorization. Further, Wilder testified, Jones and McDaniel were first cousins and wanted their family members recommended for certain positions and a salary increase for the one that was already employed in the school system, thus creating a personal and financial stake for their family.
¶ 30. Nothing in the record exists to substantiate Wilder's assertion that McDaniel, Stanton, or Jones had a personal or financial stake in the outcome of his termination. Wilder's arguments are based on pure speculation and opinion. Stanton, the only one of the three accused of having a personal or financial stake in Wilder's termination called to testify, testified that he was able to remain impartial throughout the hearing despite the fact that he did not vote for Wilder for superintendent. It would not be logical to find that any Board member who did not support a particular candidate for superintendent cannot be impartial in a later hearing because he or she had a personal stake in the matter. The argument that these Board members had a personal or financial interest in his termination which denied Wilder the right to an impartial tribunal is without merit.
IV. DID THE CHANCELLOR ERR IN FINDING THAT THE MAJORITY OF THE BOARD DID NOT HAVE PERSONAL ANIMOSITY TOWARD WILDER?
¶ 31. Wilder argues that after McDaniel was elected to the Board, the majority shifted and was hostile toward Wilder because the members of the Board that now made up the majority had originally voted against him being superintendent. Again, it would not be logical to find that any Board member who did not support a particular candidate for superintendent cannot be impartial in a later hearing to determine that person's employment status. Wilder argues that the Board's hostility and animosity grew when he filed for a temporary injunction against them after they changed his contract.
¶ 32. Wilder argues that Stanton and Jones voted against him because they wanted Dorsey to be superintendent. He argues that this shows Stanton and Jones were against him from the start. Once Stanton, Jones, and McDaniel became the majority, the Board held three or four meetings every month, as opposed to one a month, and Wilder's contract was brought up at every meeting. Wilder testified that McDaniel told him "the handwriting is on the wall," and Stanton threatened to fire him if he filed a lawsuit over the housing allowance issue. Stanton denied threatening to fire Wilder. Stanton further testified that although he did not vote for Wilder for superintendent or to give him the $500 housing allowance, he knew his responsibility was to remain objective at the hearing.
¶ 33. Another reason cited for the Board's animosity was Wilder's refusal to recommend family members of the Board for certain positions. Wilder testified that the Board grew even more hostile when he informed them of a law that prohibited putting such recommendations on the agenda.
¶ 34. Wilder presented a letter from the president of the Parent Teacher Association expressing concern with the children's education in light of the unethical and unprofessional behavior of the Board which had become an embarrassment to the community. This letter was given to the local media as a letter to the editor. The letter stated that Wilder had been *93 harassed and intimidated by the Board which prevented him from fulfilling his job duties. The examples of the unprofessional behavior given were shouting at and censoring the superintendent. Concern was also expressed over the Board allegedly voting unethically on certain matters creating a conflict of interest.
¶ 35. Wilder asserts that the reasons given overcome the presumption of honesty and integrity normally given to school boards. Other than the disputes discussed, nothing in the record exists to substantiate Wilder's allegations that the Board was "out to get him" besides his opinions. Only two Board members were called to testify. Besides Stanton, no other Board members allegedly "out to get" Wilder were called to testify. All the other corroborating evidence presented was hearsay, and hearsay alone cannot be the basis for a finding of fact. Miss.Code Ann. § 37-9-111(6); Doty v. Tupelo Pub. Sch. Dist., 751 So.2d 1212, 1216(¶ 7) (Miss.Ct. App.1999). We find this issue to be without merit.
V. DID THE CHANCELLOR ERR IN FINDING THAT THE DECISION OF THE SCHOOL BOARD WAS BASED ON SUBSTANTIAL EVIDENCE?
¶ 36. The findings of a school board in dismissing an employee must be supported by substantial evidence. Miss. Code Ann. § 37-9-113(4). "Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred." Harris, 655 So.2d at 902 (citing Cent. Elec. Power Ass'n v. Hicks, 236 Miss. 378, 389, 110 So.2d 351, 357 (1959)). It is something more than a "mere scintilla" of evidence, Johnson v. Ferguson, 435 So.2d 1191, 1195 (Miss. 1983), and does not rise to the level of "a preponderance of the evidence." Delta CMI v. Speck, 586 So.2d 768, 773 (Miss. 1991).
¶ 37. In this section, Wilder reargues the issues presented above and asserts that the Board did not present substantial evidence in the way of documentation or corroborating testimony to support its decision since nothing was in his personnel file and he had not been reprimanded. As to the allegation of insubordination, Wilder argues that the incident regarding his housing allowance was an attempt to set him up for charges of insubordination. Stanton testified that Wilder failed to comply with the Board's decision to stop his $500 a month housing allowance after the Board voted to discontinue it because Wilder did not live in the district (although there was no formal requirement that he live in the district). Wilder argues that he did not instruct the accounts manager to reinstate his housing allowance; he merely inquired about the status of the allowance. The housing allowance was apparently temporarily reinstated pending direction from the Board attorney.
¶ 38. Wilder urges this Court that his case is comparable to that of Noxubee County Bd. of Educ. v. Givens, 481 So.2d 816 (Miss.1985). In Givens, a teacher was terminated for insubordination and neglect of duty. Id. at 817. The supreme court reinstated the teacher after it found that her termination was the result of an administrative error by the school system in transferring Givens to another school. Id. The court found that a teacher may not be discharged for neglect if he or she was never assigned. Id. at 819. This case is clearly distinguishable from Givens in that substantial evidence was presented by the Board in this case regarding problems with Wilder whereas the teacher in Givens was terminated due to a mistake.
*94 ¶ 39. As stated above, we find that substantial evidence existed to find that Wilder's dismissal was not arbitrary or capricious. While nothing was given to Wilder in writing about his performance, two board members testified that these matters were discussed with Wilder during closed meetings. Further, Wilder himself complained that after the Board meetings were increased to three to four meetings a month, his contract was a usual topic of discussion. The evidence showed that Wilder was aware of problems between himself and the Board.
¶ 40. Wilder has sought to explain away all the Board's allegations, but the evidence is clear that problems with his job performance continuously grew. Substantial evidence existed to justify the Board's conclusion that there had been a total breakdown in communication as well as other problems.
¶ 41. Finding no error in the conclusions of the Board, we affirm.
¶ 42. THE JUDGMENT OF THE COPIAH COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
MYERS, P.J., GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.
IRVING, J., DISSENTING:
¶ 43. On the unique facts of this case, I believe the decision of the Board of Trustees of the Hazlehurst City School District (Board) to terminate Superintendent Shelton Wilder was arbitrary and capricious and without good cause. Therefore, I dissent. I would reverse and render the decision of the Board and the decision of the chancellor affirming the Board's decision.
¶ 44. The basis of my dissent is simple and straightforward: there is absolutely no evidence to support a finding that after Wilder signed the contract on September 17, 2004, he committed any conduct within the meaning of Mississippi Code Annotated section 37-9-59 (Rev.2001) which warrants his dismissal as superintendent of the Hazlehurst City School District. The recitation of a few facts is in order.
¶ 45. On September 7, 2004, the president of the Board signed and tendered to Wilder a three-year contract for the period beginning July 1, 2004, and terminating on June 30, 2007. The contract provided that it was authorized by "the Board in accordance with its action taken in a meeting held on the 30 day of June 2003."[1] The contract provided, among other things, that "[t]he Board shall provide the Superintendent with periodic opportunities to discuss the Superintendent-Board relationship and shall inform him annually of any inadequacy as perceived by the Board." The contract further provided that "[t]hroughout the term of [the] contract, the Superintendent shall be subject to discharge for good and just cause(s)."
¶ 46. Wilder signed the contract "under protest, without prejudice and with reservation of all rights," on September 17, 2004. Written beneath his signature is the following statement:
Signed under protest in that I disagree as to the modification of employment contract dated February 4, 2004, specifically as to the provision of the District Wide Curriculum and Instruction Clause, which reads as follows:

*95 "Such supplement shall be approved by the Board annually. In the event the Board hires an employee to perform duties relating to district-wide curriculum and instruction this supplement will automatically cease effective the hiring date."
I did not assent to this provision being placed in the August 11, 2004 revised contract tendered to me by the Board on September 7, 2004, and I reserve the right to protest this element of the contract.
¶ 47. Three days after Wilder signed the contract, the Board fired him. It gave the following reasons for his dismissal:
1. Neglect of Duty
a. Mr. Wilder has been excessively absent from the office and when he is present it is for limited amounts of time.
b. Mr. Wilder has failed to address the needs of staff members as well as principals and other individuals who he has been employed to supervise.
c. Mr. Wilder has failed to maintain open lines of communication and make himself available to the needs of the administrative staff resulting in consistent delays involving time sensitive matters.
d. Communication between Mr. Wilder and the Board has broken down resulting in an ineffective working relationship and loss of confidence by the Board in Mr. Wilder's ability to be an effective superintendent.
2. Insubordination
a. Mr. Wilder has refused to comply with actions that have been voted on by the board and reflected in the minutes.
b. Mr. Wilder has refused to maintain an open line of communication with the Board President after numerous requests by the President and other members of the board.
c. Mr. Wilder has refused to adhere to requests made by the board and consistently threatens the board with lawsuits.
3. Abuse of Discretion
a. Mr. Wilder has consistently challenged employees in the district's administrative office to take actions that are in direct contradiction to actions taken by the board.
b. Mr. Wilder has consistently interfered with school officials including but not limited to principals, coaches, and teachers in their efforts to perform their duties.
4. Failure to adhere to and comply with Board Policy
a. Mr. Wilder has allowed various individuals to address the board without advising of the nature of their communication as outlined in Board Policy.
b. Mr. Wilder has refused to work with the Board President, after numerous requests, to work to create an agenda that would work to facilitate the needs of the district.
¶ 48. The record does not reveal any incidents of dereliction of duty by Wilder between September 7, the date he was given the contract, and September 20, the date of his dismissal. As previously noted, the contract provides that "[t]hroughout the term of [the] contract, the Superintendent shall be subject to discharge for good and just cause(s)." In my judgment, when Wilder signed the contract on September 17, a binding contract between the Board and Wilder came into existence. Thereafter, the Board could only dismiss Wilder for "good and just cause(s)."
*96 ¶ 49. To hold that Wilder could be dismissed solely on the basis of things that had transpired prior to the execution of the contract is to emasculate, if not render totally meaningless, the contractual provision that "throughout the term of the contract, the Superintendent shall be subject to discharge for good and just cause(s)." It seems quite logical that, by signing the contract, the parties intended to proceed with the understanding that Wilder would be judged, evaluated, and dismissed, if appropriate, on the basis of actions or inactions occurring after the execution of the contract. Even then, the parties contemplated attempting to work out any real or perceived inadequacies prior to dismissal. As already noted, the contract provides that the "Board shall provide the Superintendent with periodic opportunities to discuss the Superintendent-Board relationship and shall inform him annually of any inadequacy as perceived by the Board."
¶ 50. If Wilder had committed an infraction between September 7 and September 20, the Board would have been justified in considering pre-contract behavior, provided the recent behavior was indicative of a continuing pattern of pre-contract behavior or was behavior unknown to the Board at the time the Board entered into the contract. See Merchant v. Bd. of Trustees of the Pearl Mun. Separate Sch. Dist., 492 So.2d 959 (Miss.1986). My review of the record reveals that all of the reasons given for terminating Wilder were known to the Board before it tendered Wilder the three-year contract.
¶ 51. It seems to me that the real reason the Board terminated Wilder is his signing the September 17 contract under protest. A dismissal decision undergirded by this reason is, in my judgment, by definition arbitrary and capricious. Wilder's signing the contract under protest did not affect the viability or enforceability of the contract. See Price v. Oklahoma Coll. of Osteopathic Med. and Surgery, 733 P.2d 1357 (Okla.Civ.App.1986). Therefore, in my judgment, the Board breached the contract and should be required to reinstate Wilder or pay damages for its unilateral, unjustifiable breach. I would reverse and render the decision of the trial court and remand this case to the Board with instructions to either reinstate Wilder or buy him out of his contract.
CHANDLER, J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] I assume the date should be June 30, 2004.