10 So.3d 495 (2007)
HINDS COUNTY SCHOOL DISTRICT BOARD OF TRUSTEES, Appellant,
v.
R.B., a Minor by and through his Next Friend, D.L.B., Appellee.
No. 2006-CA-00326-COA.
Court of Appeals of Mississippi.
September 18, 2007.
Rehearing Denied April 29, 2008.
*497 Ian Charles Jones, Ryan Robertson Sadler, James A. Keith, Jackson, David Earl Rozier, attorneys for appellant.
Latrice Westbrooks, Jackson, attorney for appellee.
Before KING, C.J., GRIFFIS and BARNES, JJ.
KING, C.J., for the Court.
¶ 1. The Hinds County School District appeals the chancery court's decision to reverse the expulsions of R.B., a minor and student of the Hinds County School District and to expunge the expulsions from his record. The chancellor determined that the School Board's decisions were unsupported by substantial evidence, were arbitrary and capricious, and violated R.B.'s rights of due process. Finding no error, this Court affirms.

FACTS
¶ 2. In February 2004, R.B., a minor, was a student at Byram Middle School. On February 5, 2004, R.B. was called to the office of Principal David Campbell. Campbell advised R.B. that an anonymous female student had informed Campbell that R.B. tried to sell her drugs the previous afternoon. R.B. consented to a search of his backpack, and Campbell also conducted a physical search of R.B.'s person. During the physical search, Campbell had R.B. remove his shoes, socks, and outer shirt. Campbell also searched R.B.'s pants pockets and then asked R.B. to remove any items from his underwear, which he refused to do. The search turned up a cigarette lighter, several CDs, and a nail file device, which Campbell found in a compartment of R.B.'s backpack.
¶ 3. Campbell called R.B.'s father, D.L.B., to come to the school. According to the father's testimony, Campbell accused his son of selling drugs. When D.L.B. arrived at Byram Middle School, he met with Campbell. D.L.B. testified that Campbell told him that "we know he's got some [marijuana], but we didn't find it on him." Campbell asked D.L.B. to finish the physical search of R.B. by having R.B. remove his underwear. D.L.B. refused. D.L.B. then testified that Campbell threatened his son with expulsion for possession of a weapon-the nail file device-if D.L.B. did not complete the physical search. D.L.B. again refused to strip search his son, so Campbell called the police to take R.B. to the juvenile detention center.[1]
¶ 4. Campbell recommended that R.B. be expelled for one year. Under the appeals structure for disciplinary proceedings, that recommendation proceeded to the Appeals Committee. The Appeals Committee is made up of three members and a hearing officer, who is responsible for conducting the hearing. R.B., through his father, D.L.B., received a letter of notice regarding the Appeals Committee hearing.
¶ 5. The Appeals Committee held its hearing on February 17, 2004. The three-person committee reviewed the principal's recommendation and the security officer's report identifying the nail file device as a "pocket knife." The hearing officer's testimony indicates that the nail file device was not at the hearing and was not made available for the committee to view. D.L.B. attended the Appeals Committee hearing and spoke on behalf of his son. The Appeals *498 Committee recommended that R.B. be expelled from Byram Middle School and transferred to the alternative school for the remainder of the school year plus the first nine weeks of the next school year, to be followed by probation for the rest of the following semester.
¶ 6. The School Board then held a hearing on March 11, 2004, to consider the recommendation of the Appeals Committee. R.B. also received a letter of notice regarding the School Board hearing. D.L.B. and R.B. appeared at the hearing, and D.L.B. spoke on his son's behalf. D.L.B. also presented a nail clipper as representative of the nail file device on which his son's disciplinary action was based. The Appeals Committee hearing officer disputed D.L.B.'s characterization of the nail file device in his oral report to the School Board. The nail file device, however, was not available for viewing. The School Board decided to have the hearing officer fax over a photocopy of the nail file device the following day and to allow the superintendent to review the photocopy. If the superintendent determined that the nail file device matched the hearing officer's description, the School Board would uphold the decision.
¶ 7. The following morning, the superintendent received a faxed photocopy of the nail file device. Although the object itself has three attachments, only one prong of the device, which resembles a knife blade, was displayed in the photocopy. The superintendent unilaterally determined that the object depicted in the photocopy was a "weapon;" therefore, the decision of the Appeals Board was upheld. The superintendent faxed a copy of the document she had received to D.L.B. R.B. later received notice of the School Board's decision, which he timely appealed to the chancery court.
¶ 8. Pursuant to the School Board's decision, R.B. was transferred to the alternative school for the remainder of the school year. On May 19, 2004, the school's resident police officer received a report that R.B. and another student had marijuana in their possession. As the officer and the principal were headed to R.B.'s classroom, another student spotted them and alerted the class. The officer took R.B. back to the office and questioned him. R.B. stated that another student, J.D., had offered him marijuana but that R.B. "didn't mess with the stuff." R.B. stated that when J.D. realized that the principal and school officer were coming into the classroom, J.D. threw the marijuana at R.B. and told him to hide it. R.B. threw the drugs onto a bookshelf. R.B. signed a type-written statement to that effect.
¶ 9. J.D. admitted to buying marijuana from two other students. J.D. further stated that he "gave all of the marijuana to [R.B.] and [R.B.] tried to frame him by hiding it in [J.D.'s] desk." A third student, the one who alerted the class to the principal's approach, submitted a written statement to the effect that R.B. and J.D. were trading the marijuana back and forth but that R.B. was the one in possession and was attempting to sell it.
¶ 10. On the basis of this incident, the alternative school's principal recommended a one-year expulsion for R.B. R.B. received notice of the Appeals Committee hearing. This time, R.B. spoke on his own behalf, as D.L.B. was unable to attend. The Appeals Committee adopted the principal's recommendation of a one-year expulsion, and the matter was transferred to the School Board.
¶ 11. R.B. and D.L.B. did not receive notice of the School Board hearing. They knew, from previous experience, when the School Board met and happened to hear that R.B.'s case was being heard on the *499 evening of June 10, 2004. When R.B. and D.L.B. arrived at the School Board hearing, they were not given an opportunity to be heard. D.L.B. testified that when he asked to see the evidence against his son, particularly the statements from the other students, he was denied the opportunity even to view the statements because the School Board required that the identities of those students be kept confidential. The School Board upheld the Appeals Committee's recommendation for a one-year expulsion. R.B. and D.L.B. received notice of the expulsion via letter dated June 11, 2004.
¶ 12. On April 8, 2004, following the initial order of expulsion regarding the incident with the nail file device, R.B. and D.L.B. appealed the School Board's decision to the Hinds County Chancery Court. When R.B. was expelled from the alternative school in June 2004, R.B. and D.L.B. amended their appeal to include the marijuana possession incident.
¶ 13. The chancellor held a hearing on February 8, 2005, which was continued until October 5, 2005. Following the hearing, the chancellor overturned both expulsions. With regard to the incident involving the nail file device, the chancellor found that the School Board's decision was arbitrary and capricious and not supported by substantial evidence due to the School Board's utter failure to inspect the nail file device and to make an independent determination regarding the classification of the device as a weapon. With regard to both the nail file device and the marijuana incidents, the chancellor held that the School Board violated R.B.'s due process rights. The chancellor reversed the expulsions and ordered R.B.'s record expunged.[2]
¶ 14. The Hinds County School District Board of Trustees appealed. The School Board argues that the chancellor erred in finding that both of the School Board's disciplinary decisions regarding R.B. were arbitrary and capricious, unsupported by substantial evidence, and in violation of R.B.'s constitutional rights.

STANDARD OF REVIEW
¶ 15. A school board is an administrative agency to which certain powers and duties have been delegated, including the responsibility of conducting the final review on student disciplinary matters. Loftin v. George County Bd. of Educ., 183 So.2d 621, 622 (Miss.1966); Miss.Code Ann. § 27-7-301(e) (Supp.2006). In reviewing the decision of a chancellor regarding an agency decision, this Court will affirm the agency decision unless that decision "(1) was unsupported by substantial evidence; (2) was arbitrary or capricious; (3) was beyond the power of the administrative agency to make; or (4) violated some statutory or constitutional right of the complaining party." Mississippi Sierra Club v. Mississippi Dep't of Envtl. Quality, 819 So.2d 515, 519(¶ 15) (Miss. 2002).

ANALYSIS

1. Disciplinary proceedings regarding the nail file device incident
¶ 16. The School Board argues that the decision to uphold the Appeals Committee's recommendation to suspend R.B. for possession of a weapon was supported by substantial evidence. The School Board argues that the Appeals Committee had the report of the school's security officer, which described the nail *500 file device as a "pocket knife," thereby providing the Appeals Committee with substantial evidence to suspend R.B. for possession of a knife. The School Board then argues that it received the report of the Appeals Committee and that the Appeals Committee's report constituted substantial evidence. The School Board argues that its decision is further supported by the faxed photocopy purporting to represent the nail file device at issue.
¶ 17. In order to reverse the chancellor's decision to reverse the expulsion for possession of a weapon, the School Board must show that its decision to expel R.B. was supported by substantial evidence and was not arbitrary and capricious. Those terms are defined as follows:
Substantial evidence, though not easily defined, means something more than a "mere scintilla" of evidence, Johnson v. Ferguson, 435 So.2d 1191 (Miss.1983) and that it does not rise to the level of "a preponderance of the evidence." Babcock & Wilcox Co. v. McClain, 149 So.2d 523 (Miss.1963). It may be said that it "means such relevant evidence as reasonable minds might accept as adequate to support a conclusion. Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred." State Oil & Gas Bd. v. Mississippi Min. & Roy. Own. Ass'n, 258 So.2d 767 (Miss. 1971); United States v. Harper, 450 F.2d 1032 (5th Cir.1971); Delta CMI v. Speck, 586 So.2d 768, 773 (Miss.1991).
When an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious and an administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone. An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles. Miss. State Dep't of Health v. Natchez, 743 So.2d 973, 977 (Miss.1999); See also Burks v. Amite County Sch. Dist., 708 So.2d 1366, 1370 (Miss.1998).
Miss. Dep't of Human Servs. v. McNeel, 869 So.2d 1013, 1018 (¶¶ 19-20) (Miss. 2004). In R.B.'s case, both the decision of the Appeals Committee and the decision of the School Board were unsupported by the evidence and were arbitrary and capricious.
¶ 18. D.L.B. testified that the Appeals Committee did not conduct any real inquiry into the situation regarding the nail file device. Principal Campbell was present at the hearing but did not make a statement. Rather, he simply submitted a written report drafted by the school's security officer as evidence of R.B.'s possession of a weapon. Campbell also submitted R.B.'s disciplinary record to support the recommendation of expulsion for one year. D.L.B. was permitted to make a statement to the Appeals Committee, but the written report was the only evidence to support the charge that R.B. possessed a weapon.
¶ 19. Glenn Wilkerson, the hearing officer in charge of the Appeals Committee, testified on cross-examination that the nail file device, the alleged weapon, was not made available for the Appeals Committee to review:
Q: And was there evidence presented by the School district regarding the nail file at the meeting [of the Appeals Committee]?
A: About the nail file, yes.
Q: Yes. So you saw an actual nail file.
A: I didn't see the actual nail file at the initial hearing, no.

*501 Q: So, that I'm clear, you did not see a nail filer or any evidence presented by the School District at the initial hearing.
A: Right.
The Appeals Committee based its decision to expel R.B. and send him to an alternative school solely on the written report of the school's security officer, which described the device as a "pocket knife."
¶ 20. The School Board considered no additional evidence in its evaluation of the matter. Wilkerson testified that he presented the results of the Appeals Committee hearing to the School Board. D.L.B. testified that he was not allowed to be present for the entire meeting but was brought into the room after the presentation of any evidence against R.B. According to D.L.B., the School Board gave him five minutes to present his case. D.L.B. produced a fingernail clipper and told the School Board that it was similar to the device that his son had and that his son did not, in fact, possess a knife.
¶ 21. Upon hearing this contradictory evidence, the School Board determined that it would like to see the device. Again, however, the school failed to produce the nail file device for examination at the hearing. The School Board ultimately determined that the school would produce the device to the superintendent, and, if the device was a knife, the School Board would uphold the Appeals Committee's recommendation for R.B.'s expulsion and attendance at the alternative school.
¶ 22. The following morning, the superintendent received a facsimile from Byram Middle School which contained a photocopy of a device that appeared to be a knife. The superintendent then faxed a copy of that document to D.L.B. and told him that the School Board had decided to uphold the Appeals Committee's recommendation to expel R.B. and send him to the alternative school.
¶ 23. The Court finds that the School Board's decision was arbitrary and capricious and not supported by substantial evidence. The School Board relied solely on the report from the Appeals Committee and a faxed photocopy of an item purporting to be the "knife" found on R.B. The findings of the Appeals Committee are themselves deficient, as the Appeals Committee chose to rely on the written report characterizing the device as a "pocket knife" without examining the device themselves.
¶ 24. The School Board similarly abdicated its responsibility. The testimony in the record indicates that the School Board opted to place the final decision in the hands of the superintendent, in violation of Mississippi Code Annotated Section 27-7-301(e), which provides that the School Board must make the final determination on disciplinary matters. The superintendent received the photocopy and made the determination that the nail file device was a knife. Even if the School Board could have placed its power to make the ultimate decision regarding the disciplinary action in the superintendent, her decision to expel R.B. by relying solely upon the report from the Appeals Committee and a faxed photocopy of an item that did not match the description given by D.L.B. was arbitrary and capricious.
¶ 25. D.L.B. testified that he was outraged when he received the facsimile from the superintendent because the item did not resemble at all the nail file device that R.B. was found carrying. Having reviewed both facsimile photocopies and the actual device, this Court agrees. D.L.B. advised the Appeals Committee and the School Board that the item was a three-pronged nail file device. The Appeals Committee did not even attempt to view *502 the device. The School Board's response was no better, as it permitted the superintendent to rely upon a facsimile document that displayed only one prong of the nail file device.
¶ 26. The Court has had the opportunity to examine the device as part of its review of the record. Having viewed the device, it is clear that the School Board's decision to render a final decision without viewing the device was arbitrary and capricious. Had the School Board examined the device, it would have been able to determine that the device was not a "pocket knife," as stated by the school's security officer. Thereafter, the School Board could have used its discretion to determine whether the device could otherwise be categorized as a "weapon," as defined by Mississippi Code Annotated Section 37-11-18, or whether the device was exactly what R.B. and D.L.B. claimed it to bean unaltered nail file, which by definition in the school district's own handbook, is a permitted device. The facsimile copy attached to the School Board's letter upholding the suspension is misleading, as only one prong of the devicethe prong that most resembles a bladeis displayed. More disturbing, though, is the facsimile copy that D.L.B. received, which depicts the device at approximately three times its actual size.
¶ 27. Had the School Board conducted even a cursory examination of the actual device, it would have realized that the Appeals Committee's recommendation, which was based solely upon the written report of the school's security officer, did not constitute substantial evidence upon which to discipline R.B. for possession of a weapon. The decision of the School Board not to examine the device itself constitutes a dereliction of the School Board's duty to render decisions supported by substantial evidence. To take the word of the Appeals Committee, which was based solely upon the written report of the school authorities who sought R.B.'s expulsion, and a facsimile photocopy of a device that the School Board did not even view is a textbook example of an arbitrary and capricious decision.
¶ 28. Accordingly, this Court holds that the chancellor correctly determined that the School Board's decision to expel R.B. for possession of a weapon was unsupported by substantial evidence and was, therefore, arbitrary and capricious. The chancellor's decision to reverse the School Board's disciplinary action against R.B. for possession of a weapon is affirmed.

2. Disciplinary proceedings regarding the marijuana incident
¶ 29. The School Board argues that the evidence of the possession of marijuana was sufficient to support the School Board's decision to expel R.B. for one year. The School Board also contends that R.B. received proper due process under the law or, alternatively, that even if he did not receive due process, that he was not substantially prejudiced.
¶ 30. A student facing disciplinary action is entitled to procedural due process because the potential loss of the ability to attend school and receive an education impacts a student's property rights. See Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Goss provides that for short-term suspensions, defined by the United States Supreme Court as ten days or less, a student should be provided with "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. at 580, 95 S.Ct. 729. The Court noted, however, that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, *503 may require more formal procedures. Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required." Id. at 584, 95 S.Ct. 729.
¶ 31. Mississippi follows Goss and has determined that in some situations, more than minimal due process is required. In Jones v. Board of Trustees, 524 So.2d 968 (Miss.1988), the Mississippi Supreme Court held that ordinarily a student should be provided with a list of witnesses. Jones, 524 So.2d at 973 (applying Keough v. Tate County Bd. of Education, 748 F.2d 1077, 1083 (5th Cir.1984)). Jones also acknowledges that "how much process is due depends on the particular circumstances." Based on the circumstances of this case, R.B. was denied procedural due process at both the Appeals Committee level and at the School Board level.
¶ 32. The letter of notice of hearing for the Appeals Committee meeting on the marijuana incident is included in the record. That letter provides that R.B. was entitled not only to a meaningful opportunity to be heard at the Appeals Committee hearing but also with the right "to cross-examine or otherwise pose questions to persons giving statements adverse to the student." The Appeals Committee received evidence in the form of written statements from the other students involved in the incident who placed the blame on R.B. Not only was R.B. not allowed to pose questions to these students, who were not present at the hearing, the Appeals Committee advised D.L.B. that R.B. had no right to even know the names of those students who accused him.[3] Accordingly, regardless of whether R.B. received the minimal due process to which he was entitled as a matter of course, he was deprived of the additional due process protections which the Appeals Committee guaranteed him. See Warren County Bd. of Educ. v. Wilkinson, 500 So.2d 455 (Miss.1986) (holding that where a school board guaranteed a student the opportunity to cross-examine the witnesses against her, failure to provide witnesses constituted a deprivation of procedural due process).
¶ 33. In addition to the due process deprivation at the Appeals Committee level, R.B. received absolutely no notice of the June 10, 2004, School Board hearing in which the School Board was to review the Appeals Committee's recommendation of expulsion for one year and render a final decision on the disciplinary proceeding. D.L.B. testified that he had no knowledge of what transpired at the School Board meeting:
I don't think that there was any testimony at the meeting becauseI don't know. The actual board meeting, I didn't evenI wasn't on the agenda for the board meeting. And the first time, they sent me a letter. I guess I was on the agenda, and they told me when to come for the School Board hearing. And on the second one, I didn't get a letter, but we just went anyway, because I knew that they were meeting that Thursday. And since we weren't on the agenda then, the board might have met about it, but we didn't meet with them because we weren't on the agenda so, of course, we weren't able to go in and *504 meet with them. But then I did get this letter, I guess about a week later, that told me that they had upheld Mr. Stewart's decision or the committee's decision.
Due process, as well as R.B.'s first experience with the School Board, required that R.B. be provided with, at a minimum, "notice and an opportunity to be heard." Jones, 524 So.2d at 972. He received neither notice nor an opportunity to be heard.
¶ 34. Additionally, the Court also notes that R.B. was facing more than a short suspension. He was facing expulsion for a calendar year. A one-year expulsion is precisely the type of protracted deprivation of property rights with which the Supreme Court was concerned in Goss and which should require more than the minimal procedural due process protections of notice and a right to be heard.
¶ 35. The Court finds that the chancellor was correct in concluding that R.B. was deprived of his constitutional rights and failed to receive procedural due process. Accordingly, this Court affirms the chancellor's order reversing R.B.'s expulsion from the alternative school for possession of marijuana.
¶ 36. The dissent notes a concern that the chancellor conducted a full hearing with live testimony. After noting that concern, the dissent acknowledges that there was no objection to that process, so that the testimony taken before the chancellor is a part of the record for this Court's consideration.
¶ 37. Where a chancellor receives testimonial evidence, he/she sits as the trier of fact, and where supported by the record, this Court must defer to the findings of fact made by that chancellor. Stokes v. Campbell, 794 So.2d 1045, 1048(¶ 11) (Miss.Ct.App.2001). Inherent in sitting as the trier of fact is the responsibility to make determinations regarding the credibility of witnesses. Id. The dissent would seem to attempt to decide the issue of credibility of the various witnesses, and in so doing, make its own findings of fact. This Court is not permitted to do.
¶ 38. The dissent suggests that because the School Board lacks subpoena power, it can not be faulted for its failure to even attempt to have available at a hearing all of the witnesses upon whose testimony it would base a decision. Such a remark is not well grounded in reason. In most student discipline hearings, the witnesses are either school employees or other students. To suggest that the School Board could not insure that its employees were present for a hearing is at best incredulous. While the School District perhaps has less control over getting students to appear, that lessen control does not relieve the District of the responsibility to make a good faith effort to have the students available, where accepts their secondhand testimony as a basis for its actions. There is nothing in the record before this Court, which suggests any effort, good faith of otherwise, was attempted to have the students available for a hearing.
¶ 39. This failure is of particular concern since the School District informed the student that he had a right "To cross-examine or otherwise pose questions to persons giving statements adverse to the student." If the District fails to make any effort whatsoever to have available for cross-examination the persons whose adverse testimony it intends to use as support for its decision, the promise of due process, as stated by the District's letter, is a nullity
¶ 40. The dissent finds no abdication of responsibility by the school board in allowing the superintendent to view the item and make a determination as to *505 whether the item was in fact a knife and then impose punishment. The school board, and not the superintendent, has the duty to act as fact finder. That duty is not subject to delegation. During the course of argument, counsel for the school board acknowledged that the duty to determine whether the item was a knife had been delegated to the superintendent. When the school board delegated that duty it of necessity delegated the determination of punishment. Such an action is arbitrary and capricious.
¶ 41. The dissent, as a part of its effort to find that the student was given due process, would have this Court hold that a student is only entitled to a listing of student witnesses if school policy requires it. As support for this position, the dissent looks at a limited portion of the relevant discussion in Jones v. Pascagoula Mun. Sep. Sch. Dist., 524 So.2d 968, 973 (Miss. 1988). A full reading of the relevant discussion belies that suggestion.
¶ 42. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
IRVING, CHANDLER, BARNES, AND ISHEE, JJ., CONCUR. ROBERTS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE AND MYERS, P.JJ., and GRIFFIS AND CARLTON, JJ.
ROBERTS, J., dissenting.
¶ 43. The majority finds that the chancellor was correct when she found that the Hinds County School Board acted arbitrarily and capriciously when it transferred R.B. to the Hinds County alternative school. The majority also finds that the School Board violated R.B.'s due process rights when it expelled R.B. After a thorough review of the record, I am convinced that the School Board acted on substantial evidence when it transferred R.B. to the alternative school. Stated differently, I am of the opinion that the School Board did not act arbitrarily or capriciously. I am convinced that the School Board's decisions incident to both of R.B.'s disciplinary referrals were reasonable and within the sound judgment and discretion of the School Board. Further, I cannot conclude that the School Board violated R.B.'s due process rights. Accordingly, I respectfully dissent.
¶ 44. I must mention a troublesome matter not addressed by the majority nor raised by the partiesthe fact that the chancellor opened the record for additional testimony. After the Board expelled R.B., R.B. appealed to the chancery court. The chancellor reversed the Board. In so doing, the chancellor heard live testimony and allowed the submission of documentary evidence and exhibits. When the matter went before the chancellor, the chancellor sat as an appellate court. In reviewing the Board's decision, the chancellor, like this Court was limited to consider the record before the Board. Mississippi State Tax Comm'n v. Mississippi-Alabama State Fair, 222 So.2d 664, 665 (Miss.1969) (any appeal of an administrative agency will be considered a "limited appeal.") The chancellor should not have allowed the presentation of new evidence or considered evidence that was not in the record before the Board. Even so, neither party objected at trial. As such, that additional and improperly considered evidence is in the record before this Court.

I. The February 2004 Incident
¶ 45. The chancellor found that the School Board acted arbitrarily and capriciously when it transferred R.B. to the Main Street Alternative School. The *506 chancellor also found that the School Board's decision lacked the support of substantial evidence. The majority affirms both decisions.
¶ 46. R.B.'s transfer to the Main Street Alternative School arose out of events that transpired during the early part of February of 2004. As of February of 2004, R.B. was twelve years old. He was in the sixth grade at Byram Middle School. On February 4, 2005, a female student told Assistant Principal Chad Shealy that R.B. tried to sell her marijuana while she waited on campus to be picked up from school. The next day, Shealy passed that accusation along to Principal David Campbell. At Campbell's request, Shealy and Deputy Scott Linschoten escorted R.B. to Campbell's office. Campbell confronted R.B. with the allegation.
¶ 47. R.B. denied that he had marijuana, but when requested by Campbell, he was able to name two other students who had marijuana.[4] Campbell asked R.B. whether he would consent to a search. R.B. consented and a search of R.B.'s backpack turned up the "device" at issue. R.B. also had some CD's, which are prohibited by school policy. R.B. removed his shoes and his socks, and then emptied his pockets. When asked whether he had anything else on his person, R.B. reached into his pants and pulled out a cigarette lighter.
¶ 48. Again, R.B. was asked if he had anything else on his person that he should not have at school. R.B. then began to undo his pants as though he was going to remove them. Campbell immediately stopped R.B. and called R.B.'s father, D.L.B. Campbell informed D.L.B. that R.B. was pulling things out of his underpants. Campbell requested that D.L.B. come to the school to further search his son. D.L.B. told Campbell that he and his lawyer would be at the school in thirty minutes.
¶ 49. When D.L.B. arrived, Campbell offered to let him use his private restroom to complete the search of R.B. D.L.B. became visibly upset. D.L.B. refused any further search of his son. He demanded that his son be arrested so he could sue the School Board. Campbell showed D.L.B. the device found in R.B.'s backpack. Because of Byram Middle School's zero-tolerance policy, R.B. was suspended until the Board could hear the matter. Campbell recommended expulsion of R.B.
¶ 50. As the majority points out, the matter then went before the Appeals Committee. The Appeals Committee reviewed Campbell's recommendation, Campbell's statement, and Deputy Linschoten's statement in which Deputy Linschoten described the device as a "pocket knife." The Appeals Committee also considered R.B.'s prior disciplinary record.[5]
¶ 51. R.B. and his parents received notice of and were present at the Appeals Committee hearing. They were also allowed to speak on R.B.'s behalf. The Appeals Committee concluded that the device was a prohibited weapon. The Appeals Committee did not follow Campbell's recommendation of expulsion. Instead, the Appeals Committee recommended that *507 R.B. be placed in the Main Street Alternative School for the remainder of the semester and a portion of the semester to follow. The Appeals Committee submitted its recommendation to the School Board for final approval.
¶ 52. At the School Board meeting, R.B. was again present and afforded an opportunity to be heard. The School Board ultimately upheld the Appeals Committee's recommendation conditional upon the superintendent's conclusion that the device was a weapon. The middle school sent a photocopy of the device to the superintendent. The superintendent concluded that the device qualified as a knife, as did the School Board.
¶ 53. The classification of the device as a weapon pursuant to Miss.Code Ann. § 97-37-17 has been a matter of some debate in this case. The chancellor and the majority find that there was no substantial evidence that the device was a knife. The majority calls it a "nail file device." However, the majority also admits that "one prong of the device ... resembles a knife blade." Deputy Linschoten called it a "pocket knife." It could arguably be described either way. A familiar and reasonable description would be that of a small "Swiss Army Knife."
¶ 54. Regardless of all previous nomenclature of the device, based on my examination, the device can be described as having three articulating retractable components all connected to a housing at a single point. Those three articulating retractable components are a can opener, a nail file, and one other component. That third component is the one at issue. In my opinion, it is not unreasonable to conclude that the third component is an "edged instrument" or an "instrument capable of causing bodily harm."
¶ 55. If there is any doubt, it is resolved by the testimony of the student and R.B.'s mother, L.B. During R.B.'s testimony, the following exchange occurred:
Q. But do you consider it a knife?
A. Yeah.
Q. All right. Do you consider this a butter knife because of the degree of sharpness it has or a lack of sharpness it has?
A. Lack of sharpness.
Q. Okay, but you do agree it's a knife?
A. Yeah.
Clearly, R.B. twice conceded that the device was a knife. While being questioned regarding the nature of the device, L.B. testified as follows:
Q. And as you now have got it displayed and in its open form, tell us the three implements that it contains.
A. I know this (indicating) is a nail file. I used this quite a bit. I used this part right here (indicating)these two parts right here, I would slit open medicine and containers, plastic, to go through like that (indicating), to open up plastic things.... These are punctures (indicating); you can use that to puncture something, and yes, sir, I did.
THE COURT: You don't really want to go there.
L.B. Yes, ma'am.
THE COURT: Remember what I told you this morning?
L.B. Yes, ma'am.
THE COURT: Okay.[6]

*508 Q. And then this implement (indicating) is a what?
A. My slicer.
Q. A slicer.
A. Yes, sir.
Q. You have even said you used it as a box cutter.
A. Yes, sirbox opener.
L.B. characterized the device as having slicing, slitting, and puncturing capabilities. L.B. also tacitly agreed that the object was capable of cutting.
¶ 56. The majority finds that the Appeals Committee's decision was not supported by substantial evidence because (a) the Appeals Committee did not examine the device, and (b) the Appeals Committee based its decision on Deputy Linschoten's written report. The majority notes that, according to D.L.B., the Appeals Committee did not conduct any real inquiry as to whether the device was prohibited. The majority cites no authority for the prospect that the written report of a security officer, without more, is not substantial evidence upon which an Appeals Committee may make a decision. Likewise, the majority cites no authority that an Appeals Committee may not reach a decision unless it first examines the alleged contraband. In many cases, the actual contraband simply may not be available to a reviewing administrative body.
¶ 57. The majority also finds that the School Board's decision was not supported by substantial evidence. The majority reaches this conclusion on the grounds that (a) the School Board abdicated its authority, and (b) the School Board did not conduct an independent review. Not only that, the majority finds that the School Board acted arbitrarily and capriciously in that it relied "solely" on the Appeals Committee's report and did not personally review the device. I disagree.
¶ 58. The majority concludes that the School Board abdicated its responsibility as provided in Mississippi Code Annotated § 37-7-301(e) when it allowed the superintendent to make the final determination as to the appropriate discipline of R.B. Pursuant to Section 37-7-301(e), school boards have the authority:
To suspend or to expel a student or to change the placement of a pupil to the school district's alternative school ... for misconduct in the school or on school property ... in the determination of the school superintendent or principal, renders that pupil's presence in the classroom a disruption to the educational environment of the school or a detriment to the best interest and welfare of the pupils and teacher of such class as a whole, and to delegate such authority to the appropriate officials of the school district.

(emphasis added). After careful review, I cannot find that the School Board abdicated its authority. The superintendent did not make the final decision as to whether R.B. would be expelled. The School Board only asked the superintendent to determine whether the device was a weapon. Once the superintendent determined that the device qualified as a weapon, the School Board made the decision to expel R.B.
¶ 59. Not only that, the record illustrates that the School Board received a photocopy of the implement. D.L.B. testified that the superintendent told him that she showed the School Board a photocopy of the device. D.L.B. also testified that he believed the superintendent when she told him that. Wilkinson testified and confirmed that the School Board received an accurate copy of the device before the School Board decided to uphold the Appeals Committee's recommendation. Combined with D.L.B.'s testimony, I would *509 conclude that the School Board was fully informed before it reached its decision.
¶ 60. The majority also concludes that the superintendent's decision was arbitrary and capricious because the superintendent relied on the Appeals Committee's report and the faxed photocopy of the device. The majority takes exception to the fact that the photocopy of the device did not match D.L.B.'s description. There is a simple and obvious reason that the photocopy did not match D.L.B.'s description D.L.B. did not accurately describe the device.
¶ 61. The majority notes that D.L.B. was "outraged" at the depiction of the device. Like the majority, D.L.B. described the device as a "nail file device." A fingernail file is certainly one of the three components of the device, but it is not the sole component. The majority points out that the superintendent and the School Board only reviewed a photocopy of one component of the device. Be that as it may, there is also a very obvious and reasonable explanation for this-the photocopied component was the only component alleged to be a knife.
¶ 62. R.B. claims that a nail file is an exempted object under this statute. I agree. However, the implement does not only contain a nail fileit also has two other components. The fact that the implement contains a nail file does not exempt it from being a weapon if it has other dangerous components.
¶ 63. The majority finds that the photocopy faxed to D.L.B. was disturbing because it showed the device at "approximately three times its actual size." While the photocopy of the device that D.L.B. received does depict the device at somewhat larger than its actual size, this fact has no bearing on the superintendent's review of the device. The superintendent reviewed a photocopy of the device that was either actually sized or possibly slightly larger than actual size. Contrary to the majority opinion, the photocopy is almost identical in size to the actual implement and it is sufficiently detailed. When extended, the edged component measures four and one-quarter inches. Further, I find no authority requiring the School Board to review the actual contraband in order to make its decision. In any event, a reasonable person could easily determine the nature of the component by viewing the photocopy.
¶ 64. Considering these facts, I am of the opinion that the School Board was well within its rights to transfer R.B. to the alternative school. Carrying a weapon on school property is against school policy. It is also illegal. Pursuant to Miss.Code Ann. § 97-37-17(d)(4) (Rev.2006):
It shall be a misdemeanor for any person to possess or carry, whether openly or concealed, any BB gun, air rifle, air pistol, bowie knife, dirk, dagger, slingshot, leaded cane, switchblade knife, blackjack, metallic knuckles, razors and razor blades (except solely for personal shaving), and any sharp-pointed or edged instrument except instructional supplies, unaltered nail files and clips and tools used solely for the preparation of food, instruction and maintenance on educational property.
The implement confiscated on February 5, 2004, fits under the statutory meaning of a prohibited weapon on school premises. One of the device's components was an edged instrument. Based on growing concerns over school violence, it is not surprising that a school would enact a zero tolerance policy regarding the possession of a weapon on school grounds. Further, the student handbook notified parents in the Hinds County public school district that weapons were not allowed on school grounds. Accordingly, I fail to see how *510 there could be an insufficient basis for the School Board's decision.
¶ 65. It is for the fact-finding body, in this case the School Board, to determine whether the "pocket knife" at issue could be classified as an "instrument considered to be dangerous and capable of causing bodily harm" or a "sharp-pointed or edged instrument." See Clinton Mun. Separate Sch. Dist. v. Byrd, 477 So.2d 237, 242 (Miss.1985). We are not charged with determining the nature of the device. Rather, we are required to protect the student from an arbitrary ruling. Based on witness characterization of this object as a "knife" capable of slicing and penetrating boxes, I can not find that the School Board's conclusion was unreasonable.
¶ 66. As mentioned, the School Board considered statements from Deputy Linschoten and Campbell. Both were involved with the confiscation of the device. Both had personal knowledge of its nature. Deputy Linschoten referred to the device as a "pocket knife." To be specific, he listed the three components of the device as "a knife blade, a nail file, and a bottle opener." While it is possible that a security officer's classification, without more, might be insufficient evidence, compounded with an accurate picture of the implement, Campbell's report, and R.B.'s prior record, at a minimum these documents are "more than a mere scintilla of evidence." Johnson v. Ferguson, 435 So.2d 1191, 1195 (Miss.1983). The School Board reviewed an accurate picture of the device and statements of people with personal knowledge of the facts. In my opinion, this is a sufficient evidentiary foundation to warrant such a disciplinary action.
¶ 67. According to the majority, if the School Board had reviewed the device sufficiently, it would have concluded that the device was not a knife. The majority concludes that the School Board's decision amounts to a "textbook example" of an arbitrary and capricious decision. I cannot agree. To borrow the majority's analogy, based on a complete review of the facts, I am of the opinion that, like the chancellor's decision, the majority's decision amounts to a "textbook example" of this Court substituting its view for the School Board's.
¶ 68. As for R.B.'s due process rights incident to the Appeals Committee's decision and the School Board's decision, I find no due process violations incident to either. Although Campbell recommended that R.B. be expelled, R.B. was not expelled.[7] There could be no violation of R.B.'s due process rights incident to the School Board's decision to place R.B. in the Main Street Alternative School because R.B. is not guaranteed due process incident to such a decision. A student is guaranteed due process in an instance warranting expulsion because the loss of an opportunity to attend school and receive an education impacts a student's property rights. See Goss v. Lopez, 419 U.S. 565, 575, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Expulsion contemplates the cessation of public education. However, R.B. was not expelled. Instead, R.B. was transferred to the Main Street Alternative School. Accordingly, there was no denial of R.B.'s property right to a public education and any argument *511 that R.B.'s due process rights were violated are misplaced. However, if the Board decided to expel R.B. outright for the knife incident, I would still find no due process violation. R.B. was given notice of the Appeals Committee hearing and an opportunity to be heard at that hearing.

II. The May 2004 Marijuana Incident
¶ 69. Approximately three and one-half months after the "pocket knife" incident, R.B. was expelled for possession of marijuana at the Main Street Alternative School. On May 19, 2004, R.B. was implicated among a group of students for possession of marijuana. The relevant factual background is evident from statements before the Appeals Committee and the School Board. Statements from two students, J.D. and D.M., indicated that R.B. had marijuana at school that day. D.M. indicated that R.B. sold marijuana to one student and gave more marijuana to another student. Security Officer Kelvin Mixon stated that he and Principal Bob Mohr escorted R.B. to the principal's office to interview him regarding the fact that they received information that he had marijuana. Mixon asked R.B. to tell him where he had hidden the marijuana. According to Mixon, the marijuana was discovered behind some books in a bookshelf at the back of the classroom near where R.B. had been sitting. According to R.B.'s statement:
I, R.B., spoke with [J.D.] and he said I got some stuff for you, do you want to buy it and I told him I don't fool with that then later on [D.M.] came in the classroom and yelled they're snitching, then [J.D.] stood up and said "ol snap" and then he hid something behind the desk and threw two bags of marijuana to me and then said please hide this for me and I caught the marijuana and threw it on the bookshelf.
¶ 70. Mohr recommended that R.B. be expelled from the Main Street Alternative School. The Appeals Committee met to review Mohr's recommendation and heard R.B.'s version of the incident. The majority notes that R.B. received notice of the Appeals Committee hearing and that R.B. was afforded an opportunity to speak on his own behalf at the hearing. However, the Appeals Committee agreed with Mohr and recommended that R.B. be expelled. After the Appeals Committee submitted its recommendation to the School Board, the School Board agreed and expelled R.B. from the Main Street Alternative School.
¶ 71. R.B.'s statement could be construed as a quasi confession. He admitted that he had the marijuana in his possession, if only for a brief time. Since marijuana is illegal contraband, one can not own itone can only "possess" it. Miss. Code Ann. § 41-29-139(a) (Rev.2005). That is, one can only exercise some degree of conscious control or dominion over marijuana. R.B. admitted that he hid marijuana for another student. J.D. and D.M. stated that R.B. had marijuana at school. Statements from Officer Mixon and Mohr confirmed that R.B. had dominion and control over the marijuana. Considering our standard of review, I would find that the School Board heard sufficient evidence to expel R.B.
¶ 72. The majority opines that R.B.'s due process rights were violated. It is important to consider just what due process rights R.B. has. Unfortunately, this body of law is not well-established by our statutory laws or our case law. We know that, at a minimum, R.B. is afforded due process in that he has rights to advance notice and a reasonable opportunity to be heard. Jones v. Bd. of Trustees of Pascagoula Mun. Sep. Sch. Dist., 524 So.2d 968, 972 (Miss.1988). Before he was expelled from the Main Street Alternative School, *512 R.B. received notice of the Appeals Committee hearing. He was also allowed to present his case to the Appeals Committee. I fail to see how R.B.'s due process rights were violated.
¶ 73. The majority cites Jones, 524 So.2d at 973, for the proposition that "ordinarily a student should be provided with a list of witnesses." I interpret Jones differently. The precise language in Jones reads as follows:
The Fifth Circuit Court of Appeals has held that normally a pupil should be provided a list of witnesses along with an explanation of the charges. [Keough v. Tate County Board of Education, 748 F.2d 1077, 1083 (5th Cir.1984).] In [Warren County Board of Education v. Wilkinson, 500 So.2d 455, 460 (Miss. 1986)] this Court intimated that a list of witnesses was necessary; however, there the school board's own rules required that a witness list be given.
Jones does not unequivocally hold that a student should ordinarily be provided with a list of witnesses. Instead, Jones followed Keough and Wilkinson. Jones clearly distinguished Wilkinson when it noted that a list of witnesses was necessary where the school board's own rules required such a list.
¶ 74. In Keough, a student asserted that he should have received a list of witnesses and a summary of their testimony prior to a school board disciplinary hearing. 748 F.2d at 1081. The Fifth Circuit found that the student's assertion was "not without some basis." Id. The Fifth Circuit noted that "usually these safeguards should be afforded to satisfy the fourteenth amendment in cases involving long-term suspensions." Id. (citations omitted) (emphasis added). However, the Fifth Circuit went on to note that "the process due may vary in particular cases depending upon the circumstances." Id. Keough further instructed that "[t]he standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved." Id. "Basic fairness and integrity of the fact-finding process are the guiding stars." Id. at 1081-82.
¶ 75. The student in Keough received a list of witnesses and a summary of their testimony after he arrived at the school board hearing. Id. at 1082. The Fifth Circuit found that earlier notice of witnesses was not necessary to satisfy procedural due process. Id. According to Keough:
We are guided in our analysis by reason. Reason takes into account the reality that, though very serious, the matter we are considering is a routine disciplinary matter within a public school, and is not a sophisticated court trial involving complex fact or legal issues. With this predicate in mind, we first note that the Keoughs were fully apprised of the charges, the underlying facts supporting those charges, and the nature of the hearing.
Id.
¶ 76. Keough next pointed out that the witnesses "provided no surprises against which the Keoughs were unprepared to defend or which otherwise prejudiced their ability to present their case." Id. Said differently, the Fifth Circuit found that the student "suffered no material prejudice by proceeding to hearing before the school board without a witness list" and the school board did not violate the student's procedural due process rights. Id.
¶ 77. In my opinion, R.B. suffered no prejudice in that he was not surprised by any of the witnesses. He knew each and every person involved in the proceedings. *513 True enough, R.B. did not have an opportunity to cross-examine the student witnesses, because those witnesses were not personally present to testify against him and no authority unequivocally gives him that right.
¶ 78. The majority finds that a hearing should have been conducted so that R.B. could cross-examine J.D. and D.M. However, the School Board does not have the power to compel student attendance at a hearing. Jones, 524 So.2d at 973. See also Miss. Code Ann. § 37-7-301 (subpoena power is not listed under the board of trustee's powers). If the School Board does not have subpoena power then there can be no right to compulsory process for the witness and hence no right of confrontation. Absent subpoena power, it is clearly reasonable for the Appeals Committee to rely on written reports and written statements from witnesses. What is more, from a policy standpoint, if a School Board were to compel testimony from students, such a course of action could lead to harassment of that student. D.L.B. testified:
I think when I asked Mr. Mohr who it was involving, that he told me as a matter of policy they couldn't give out students' names because they had a student who had been harassed by a parent because they had accused their kids of doing something in years past. Well, it might have been Dr. Eiland that told me that. Whenever I asked her who the other students were, she told me they couldn't give me their names because of the fact there were kids in the past who had come forth and gave evidence, and if the parents found out who they were, they would get in trouble, so she said as a policy they just didn't do that.
¶ 79. Neither R.B. nor anyone on his behalf ever attempted to cross-examine any school employee witness who was present. Moreover, when asked, R.B. stated he had no additional evidence or witnesses to present to the Appeals Committee. The Appeals Committee and the School Board considered a written report of the confiscation by two school employees, statements from students, and R.B.'s quasi confession. The marijuana was found right where R.B. said he hid it. Even if we assume that R.B. only hid the marijuana for another student, there was a significant amount of evidence that R.B. had dominion and control over marijuana in his possession. Finally, a chemical test revealed that it was, in fact, marijuana that was found. In my opinion, this evidence was sufficient to warrant expulsion.
¶ 80. To sustain a violation of procedural due process, the aggrieved party must show "substantial prejudice." Jones, 524 So.2d at 972. In the second instance, as in the first, the School Board made a decision based on substantial evidence, while casting no substantial prejudice to R.B.'s due process rights. Considering the foregoing analysis, I am of the opinion that the chancellor's ruling should be reversed and the original ruling of the School Board should be reinstated. Because the majority affirms the chancellor, I must respectfully dissent.
LEE AND MYERS, P.JJ., and GRIFFIS AND CARLTON, JJ., JOIN THIS OPINION.
NOTES
[1] Ordinarily, juveniles are required to spend the night at the juvenile detention center. D.L.B. stated that he was able to take R.B. home within thirty minutes of his arrival because the center did not want to hold him for possession of a weapon after learning the facts of the situation.
[2] The chancellor ruled that R.B. was not entitled to monetary damages due to his failure to file a notice of claim under the Mississippi Tort Claims Act. Miss.Code Ann. § 11-46-11 (Rev.2002).
[3] In this case, R.B. knew the names of the students involved, as they were also questioned by the principal at the time of the incident. As counsel for R.B. pointed out during oral argument, however, once R.B. was removed from the alternative school, he had no means of contacting these students, and simply knowing their names did not provide R.B. with the means necessary to ensure their presence at the hearing so that R.B. could question them regarding their statements.
[4] R.B. was correct. Those two students admitted they had marijuana. One student had marijuana in his backpack. He claimed he bought it from the other student for five dollars. The other student later admitted that he had marijuana. He even produced the five dollars that he received for the marijuana. Both students were arrested.
[5] R.B.'s disciplinary record for the 2003-2004 school year contained complaints for using profanity, fighting, insubordination, and disrupting class. For those infractions, R.B. had been suspended, sent to in-school detention twice, and sent to Saturday detention.
[6] It is unclear why the chancellor intervened during L.B.'s cross-examination. The chancellor might have interfered with defense counsel's ability to conduct a thorough cross-examination. It is also unclear just what the chancellor meant when she said, "Remember what I told you this morning."
[7] The chancellor ordered "both expulsions" expunged from R.B.'s record. R.B. was not expelled from Byram Middle School. As mentioned, School Boards are granted the authority "To suspend or to expel a student or to change the placement of a pupil to the school district's alternative school ... for misconduct in the school or on school property." Miss.Code Ann. § 37-7-301(e) (emphasis added). By referring to those three outcomes in the disjunctive, the legislature clearly distinguishes expulsion from school and "changing placement" to an alternative school.