# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CC-01028-SCT

*ALVIN BURKS*

*v.*

*AMITE COUNTY SCHOOL DISTRICT*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/15/94 |
| TRIAL JUDGE: | HON. R. B. REEVES, JR. |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | CHESTER NICHOLSON |
| ATTORNEYS FOR APPELLEE: | PERRY SANSING |
| | T.F. BADON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES (OTHER THAN WORKERS' COMPENSATION) |
| DISPOSITION: | AFFIRMED - 03/26/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/16/98 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This appeal is from a decision in the Chancery Court of Amite County, finding that the decision by the Amite County School Board to not renew the employment contract of Alvin Burks under Miss. Code Ann. § 37-9-109 et al., was neither racially motivated nor arbitrary and capricious. We agree with the finding by the chancellor below, and hereby affirm.

### I.

¶2. Alvin Burks was employed as a librarian in the Amite County school system, where he was responsible for the implementation of the federal Drug-Free Schools program. On March 27, 1992, Amite County Superintendent Bishop notified Burks of his recommendation to the School Board that they not renew Burks' employment contract for the 1992-1993 school year. Burks requested a hearing pursuant to Miss. Code Ann. § 37-9-109 and § 37-9-111 (1972).

¶3. Bishop derived his recommendation from revenue projections for the school district. The Amite County School District anticipated a reduction in funds available for the 1992-1993 school year. The projected revenue for 1992-1993 totaled approximately $13,014,000, down from the previous year's

total of $15,500,000. The shortfall was the result of a combination of factors, including diminished timber sales revenue, dwindling state funds, and reduced oil lease revenues. The decrease in total revenue and oil lease revenue was particularly significant because the District relied on this revenue to reduce a $3,300,000 loan received several years earlier for capital improvements. This financial quandary was intensified by cuts in projected annual tax allocation from 7 percent to 2 percent.

¶4. Superintendent Bishop acted to remedy the situation by reducing expenditures for the 1992-1993 school year pursuant to the District's Reduction in Force (RIF) policy. This policy called for the non-renewal of certain teachers' employment contracts according to two factors: the non-renewals could not adversely affect the accreditation of the District schools, and classroom instruction could not be materially impaired. The Assistant Superintendent determined areas in which staff reductions could be made under the RIF policy.

¶5. Under their RIF policy, as written, teachers were to be considered for non-renewal based upon seniority in the District. A teacher acquired seniority for the purposes of the RIF policy based upon continuous work in the area taught and in which the teacher held a valid certificate or permit.

¶6. Superintendent Bishop recommended the non-renewal of fourteen teachers for the 1992-1993 school year. Bishop limited contract non-renewals to four areas: library staff, industrial arts, social studies, and band. Of the fourteen slated for non-renewal, eight were black, while only six were white. The District finally received all but a negligible amount of the money under the minimum program; six whites were offered re-employment, while four blacks were extended such an offer.

¶7. After the non-renewal purge of fourteen teachers, two of the four black teachers who were offered reinstatement declined. The District's purge netted a loss of six black teachers and no whites. The four teachers who remained subject to the RIF policy were: Alvin Burks (librarian/coordinator of the federal Drug-Free Schools program), Lonnie Jackson (industrial arts teacher), Russell Porter (head football coach/social studies teacher), and Willie Redfield (band instructor).

¶8. The hearing on Superintendent Bishop's recommendation took place on March 22, 1992, at which time the School Board upheld Bishop's non-renewal recommendation. Burks appealed the Board's ruling to the Chancery Court of Amite County, asserting that the decision was racially motivated. The chancellor affirmed the Board's decision, finding that "the Board's non-renewal decision was a proper employment decision" and that the action "in no way violated the rights of Mr. Burks." Moreover, the chancellor found "insufficient evidence to support [race discrimination]" and found the Board's decision to be neither arbitrary nor capricious.

¶9. Burks was eventually extended a contract to serve as librarian at the high school after he filed an action in the United States District Court, but he was not reinstated as the coordinator of the federal Drug-Free Schools program. Therefore, Burks never actually left the District's employment. The federal court abstained from proceeding further, pending the instant action.

## II.

¶10. The Mississippi School Employment Procedures Law was enacted in 1977 to "establish procedures for providing public school employees with notice of the reasons for not offering an employee a renewal of his contract." Miss. Code Ann. § 37-9-101 (1977). This act does not establish

a tenure system for the state nor require that decisions for non-reemployment be based on cause. It does, however, set guidelines to protect employees against actions in violation of their statutory or constitutional rights or those which are arbitrary and capricious. The purpose of the act is to protect "employees" from "unfair and sometimes vindictive practices of their superiors." *Jackson v. Board of Education*, 349 So. 2d 550, 553 (Miss. 1977). "Employee" is defined as "any teacher, principal, superintendent elected by the Board of Trustees, and other professional personnel employed by any public school district and required to have a valid certificate issued by the state department of education as a prerequisite to employment." Miss. Code Ann. § 37-9-103 (1977). In *Jackson,* this Court interpreted the definition of "employee" to include a drug education specialist who held a valid teaching certificate and taught drug education classes throughout the school district. *Jackson*, 349 So. 2d at 553.

¶11. This Court has not addressed whether a school employee who is non-renewed in a position for which no certificate is required is nevertheless covered by the School Employment Procedures Law because the employee's other position *does* require a certificate. For the law to be applicable, two conditions must be satisfied. First, one must be among the group sought to be protected. Second, one must hold a valid certificate as a prerequisite to employment. Burks was a librarian in the school district and was required to hold a valid certificate as a prerequisite to his employment, thus satisfying the definition of employee for his position as a librarian. He did not acquire a certificate for the position of coordinator of the federal Drug-Free Schools program, however.

¶12. Protections under Miss. Code Ann. § 37-9-101 include written notice of the intention not to renew an employee's employment contract, an opportunity for a fair and impartial hearing before the board, and the right to be represented by counsel at the hearing. Written notice of non-renewal must be given "within seven days of the date when the recommendation to re-employ would have been made under the provisions of §§ 37-9-15 and 37-9-17" but in any event no later than "on or before April 8" if the employee is a "teacher or other professional educator." Miss. Code Ann. § 37-9-105 (1977). This written notice must include reasons for non-renewal and a summary of the factual basis for the decision. *Id.* Failure of a school board to comply with the notice requirements of § 37-9-105 results in automatic renewal of the teacher's contract for the ensuing school year. *Noxubee County Bd. of Educ. v. Cannon*, 485 So.2d 302, 304-305 (Miss. 1986).

¶13. In an action based upon Miss. Code Ann. § 37-9-101, this Court defers to the school board findings when there is conflicting testimony. As long as the board's findings are supported by substantial evidence, this Court will not reverse the board. *Everett v. Board of Trustees,* 492 So.2d 277, 283 (Miss. 1986). Burks claims that the Amite County School Board's actions under the guise of a reduction in force were actually a racially motivated purge. The decision to nonrenew only black employees, he argues, was arbitrary and capricious. Since the actions were allegedly based on racial factors only, Burks further alleges that his constitutional rights were violated.

¶14. The terms "arbitrary" and "capricious" have recently been defined by this Court in *McGowan v. Mississippi State Oil & Gas Bd.,* 604 So.2d 312, 322 (Miss. 1992). An act is arbitrary when it is not done according to reason or judgment, but depending on the will alone. *Id.* "Capricious" was defined as any act done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles. *Id.* Once the superintendent has given a demonstrable reason for nonrenewal of a contract, the burden shifts to the employee at

the hearing to show "affirmatively and conclusively that the reasons relied upon by the School Board have no basis in fact." *Calhoun City Bd. of Educ. v. Hamblin*, 360 So.2d 1236, 1240 (Miss. 1978).

¶15. Superintendent Bishop asserted that a decline in the District's revenue had created a situation where the District was unable to repay its outstanding debts and maintain the present level of staff and faculty. This Court has "implicitly validated the use of factors such as declining student enrollment and financial exigencies to stand as the basis for non-renewal of teacher contracts." *Byrd v. Greene County School Dist.,* 633 So.2d 1018, 1024 (Miss. 1994).

¶16. The stated reason for the reduction in force was a reduction in the state's Minimum Foundation Program funding for the Amite County School District which, when compounded by a reduction in oil lease interest revenues and timber sales, created an unmanageable financial situation, thereby necessitating a reduction in employees. The only real budget in existence at the time the District made the decision to institute the RIF policy was the one compiled for the previous year, which suggested a drop in prospective revenues. Since the chancellor's finding is supported by substantial evidence, this Court defers to his finding that the district was experiencing financial difficulties. *Everett,* 492 So.2d at 283. Having determined, then, that the chancellor's finding is supported by substantial evidence, we must also conclude that his finding was neither arbitrary nor capricious.

### III.

¶17. Burks further alleges that, even if the School District was experiencing financial crisis, the non-renewal of Burks' contract was racially discriminatory and in violation of 42 U.S.C. § 2000e *et seq.*, which prohibits employment discrimination on account of race, color, religion, sex, and national origin. The standard of review here is, accordingly, highly deferential. In a Title VII action, the "ultimate question of the existence of discrimination is a question of fact." *Pullman-Standard v. Swint*, 456 U.S. 273 (1982). A court's findings of fact may not be overturned unless they are "clearly erroneous," a standard of review discussed in *UHS-Qualicare v. Gulf Coast Community Hosp.,* 525 So.2d 746, 754 (Miss. 1987), where this Court held that "[a] finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the firm and definite conviction that a mistake has been made."

¶18. In the case sub judice, the chancellor found that the School Board's decision was supported by substantial evidence, was not arbitrary and capricious, and did not violate Burks' constitutional or statutory rights. The chancellor further found that the decision was a proper employment decision.

¶19. There are two recognized theories of liability under Title VII of the Civil Rights Act of 1964. The "disparate treatment" theory applies when "the employee can show that the employer intentionally treated the employee unfairly because of race." *Frazier v. Garrison Indep. Sch. Dist.,* 980 F.2d 1514, 1523 (5th Cir. 1993). The "disparate impact" theory applies to practices that are neutral in form, but discriminatory in fact, and intentional discrimination need not be shown." *Id.* State courts have concurrent jurisdiction with federal district courts over Title VII cases. *Yellow Freight Sys., Inc. v. Donnelly,* 494 U.S. 820, 824-825 (1990).

¶20. In a "disparate treatment" claim based on a reduction in force, a plaintiff must demonstrate that he was in a protected group and was adversely affected by an employment decision; he must show that he was qualified for his former position or for another position at the time of being adversely

affected; and, he must produce circumstantial or direct evidence by which a finder of fact might reasonably conclude that the employer intended to discriminate on the basis of race in reaching the decision at issue. *Daniels v. Westinghouse Elec. Corp.*, 772 F. Supp. 1278, 1281 (N.D. Ga. 1990). The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). This presumption then places upon the employer the burden of rebutting the prima facie case by producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason. *Id.* If the employer carries the burden of production, the presumption raised by the prima facie case is rebutted and drops from the case. *Id.* Then the employee must demonstrate, through presentation of his case and cross-examination of the employer's witnesses, that the proffered reason was not the true reason for the employment decision and that race was. *Id.* Initially, Burks' disparate treatment claim must fail because he cannot prove that he was discharged as librarian, since the District rehired Burks after the hearing and reassigned him to the position that he held when the Superintendent made the initial nonrenewal recommendation.

¶21. Burks spends the majority of his Title VII claim arguing that the reduction in force policy has an impermissible "disparate impact" on the black employees. To establish a prima facie case under the disparate impact theory, an employee must show that a facially neutral policy or practice produces a significantly adverse impact on one race. *Bunch v. Bullard*, 785 F.2d 384, 392 (5th Cir. 1986). A plaintiff must offer evidence "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642 (1989); *Johnson v. Uncle Ben's*, 965 F.2d 1363, 1367 (5th Cir. 1992). If a prima facie case is established, the employer must prove that the practice is justified by a "business necessity." *Frazier*, 980 F.2d at 1525. Therefore, this Court considers the employer's justification for the practice and whether an alternative practice exists that can achieve the same result but with less racial impact.

¶22. Although Burks argues that the disparate impact is clear because 100 percent of the employees who were not renewed were black, this conclusion is not sufficient to establish a significant statistical disparity between blacks and whites. There are ninety-nine black and eighty-two white teachers in the school district. Including Burks, the nonrenewed black teachers account for only 4.04 percent of the entire pool of black teachers in the district. This differential does not constitute a statistically significant disparity. *See Frazier v. Garrison Indep. Sch. Dist.*, 980 F.2d 1514, 1524 (5th Cir. 1993) (finding that a 4.5 percent differential in test passage rates between blacks and whites does not constitute a "significant discrepancy between minority and non-minority pass rates"); *Moore v. Southwestern Bell Tele. Co.*, 593 F.2d 607, 608 (5th Cir. 1979) (finding that a 7.1 percent selection differential between black and white applicants does not evidence the required disproportionate impact needed to make a prima facie case of discrimination).

¶23. Even assuming *arguendo* that Burks established his prima facie claim of disparate impact, the district's implementation of its RIF policy constituted a business necessity. As stated earlier, the chancellor made a finding that a financial exigency existed to warrant implementation of the RIF policy. Reliance on areas of work allowed the district to reduce staff in accordance with accreditation requirements, instructional needs, and budgeting concerns. Further, Burks failed to show that another method of staff reduction was available to meet the district's needs that would have had a lesser impact on blacks. Given these circumstances, we do not find that Burks' constitutional or statutory

rights were violated.

¶24. For the foregoing reasons, we affirm the chancellor below.

¶25. **JUDGMENT IS AFFIRMED.**

**PITTMAN, P.J., BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. PRATHER, C.J., SULLIVAN, P.J., AND WALLER, J., NOT PARTICIPATING.**