# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CC-00397-SCT

*BOARD OF SUPERVISORS OF HANCOCK COUNTY, MISSISSIPPI*

*v.*

*RAZZ HALILI TRUST*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2020 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| TRIAL COURT ATTORNEYS: | VIRGIL G. GILLESPIE |
| | GARY M. YARBOROUGH, JR. |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GARY M. YARBOROUGH, JR. |
| ATTORNEY FOR APPELLEE: | VIRGIL G. GILLESPIE |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 06/24/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. This case involves an appeal by the Board of Supervisors of Hancock County (the Board) of the Hancock County Circuit Court's reversal of the Board's decision to deny the application of Razz Halili Trust d/b/a Prestige Oysters (the Trust) to use a location within Hancock County zoned "C-4" (Zone C-4) as a marina—a use allowed as a matter of right in Zone C-4. The Board appealed, and we find that the Board's decision was arbitrary, capricious and not supported by substantial evidence and therefore affirm the decision of the circuit court.

## FACTS AND PROCEDURAL HISTORY

¶2. In late 2015, the Trust purchased a piece of property on the Mississippi coast in Hancock County to unload oysters from its boats and to ship them to Louisiana. The land is located in an area designated as "C-4" in the Hancock County Zoning Ordinance. The Trust applied to the Hancock County Planning and Zoning Commission (the Commission) for site-plan approval for a marina at the same location in November 2018. The application provided that "[t]he proposed marina will include the docking and servicing of boats to include the loading and unloading of goods, material, and seafood in a manner consistent with surrounding approved sites."

¶3. Additionally, the application stated that the "site will not include the processing of seafood or the wholesale or retail sales of any seafood at the location." Rather, "[t]he request is simply to operate a marina that will serve as a boat docking facility, to off load seafood from the boats, and to service boats using the marina." The application also included photographs and descriptions of surrounding areas and businesses, including Bayou Caddy Seafood, Pincher's Seafood, Bayou Caddy Marina and Cure's Back Bay Marina. In its application, the Trust further discussed the approval of Bayou Caddy Seafood's expansion of its seafood processing facility in 2010 without special exception or conditional use. Moreover, Pincher's Seafood, according to the Trust, received approval for variances for, among other things, "seafood processing." Further, the Trust alleges that the Pincher's Seafood site includes "a small dock . . . for the off-loading of traps."

2

¶4.     In closing, the application clarified again the proposed use: "as a marina that will include: [t]he loading and off-loading of seafood; [b]erthing of boats; [l]oading and servicing of boats; [a]nd fuel storage tank for boats." In Zone C-4, use of property as a marina is allowed as a matter of right. Hancock County, Miss., Zoning Ordinance art. IV. The ordinance defines a marina as "[a] boat basin, harbor or dock, with facilities for berthing and servicing boats, including bait and fishing tackle shop and eating establishments." Hancock County, Miss., Zoning Ordinance art. II, § 203.52.

¶5.     The Commission held a hearing on the Trust's application on January 3, 2019. At that hearing, Anthony Cuevas, the Planning and Zoning Director, was asked whether he "ha[d] any concerns or issues with the site plan that was presented by the applicant?" Cuevas responded, "No, I do not, Gary." When later asked whether the proposed use, along with a proposed fuel facility and lack of other structures, is "consistent with the marina portion of our ordinance," Cuevas replied affirmatively. The Commission voted unanimously to recommend approval of the Trust's site-plan application.

¶6.     The Board then initially reviewed the application and the Commission's recommendation on January 22, 2019, but tabled substantive discussions until February 4, 2019. At the February 4 meeting, some supervisors expressed concerns regarding the approval of the Trust's application and whether the proposed uses were prohibited or fell within the ordinance's definition of a marina. Specifically, Supervisor Adam provided that "the definition of a marina doesn't allow for the use that he's suggesting in there according

3

to the definition," to which Cuevas responded in agreement. Further, Supervisor Adam stated that "[s]ervicing a boat isn't offloading seafood" and also responded affirmatively to the Board's counsel's question: "Are you saying that you don't believe that unloading and loading seafood is allowed?" Unable to reach a determination at its February 4 meeting, the Board again tabled further consideration of the application until February 19, 2019.

¶7. At the third and final Board meeting, the Board heard argument from the Trust regarding its intended use at the site: "all we were asking for was just a site plan to unload oysters. That's all we're doing. We're going to bring the boats in, dock them. The only equipment we will have there is a conveyor to get them to the trucks, in the trucks, and then moved out." Counsel for the Board responded, "I think the question has been whether this is a marina or because of the intended use potentially processing use." Counsel for the Board then narrowed the question further: "And so we have a question where a seafood processing use is not allowed in a C4. A marina is allowed in a C4 zoning." Next, counsel for the Board recognized the ordinance's definition of a marina and the ordinance's lack of a definition of "seafood processor." The discussion then moved to a state licensing statute, Mississippi Code Section 49-15-28(2) (Rev. 2012), and its definition of a seafood processor, which includes any person "engaged in the canning, processing, freezing, drying, or shipping of oysters, fish, saltwater crabs, or saltwater shrimp."

¶8. The Board, on motion of Supervisor Yarborough, unanimously rejected the site plan and the proposed use. In response to the Board's counsel's question, "What is the intent?

4

Are you rejecting the use or the site plan itself?," Supervisor Yarborough responded, "The site plan now that it's going to be seafood processing and not a marina. That's our question before us."

¶9. The Trust appealed the decision of the Board to the Hancock County Circuit Court, arguing that the Board's decision was arbitrary, capricious and not supported by substantial evidence. After the circuit court's ruling on the record during oral argument on January 17, 2020, the court entered a written judgment on February 24, 2020. In its written order, the circuit court held that "none of the evidence submitted supports any conclusion that the property in question was to be used for seafood processing." Thus, the circuit court determined that "[o]n this record, there is no substantial evidentiary basis for the decision reached by the Board" and that the "decision must therefore be reversed." Ultimately, the circuit court reversed and rendered the decision of the Board and granted and approved the Trust's application.

¶10. The Board appeals the circuit court's decision, arguing that the Board's decision was fair and reasonable, as was its reliance on the definition in Mississippi Code Section 49-15-28(2) of a seafood processor, which encompasses shipping of oysters—an activity the Trust admitted would occur at the site. Thus, the Board argues that the Trust's proposed use fell within the prohibition on "processing uses" within Zone C-4.

**STANDARD OF REVIEW**

¶11.    The Court has recognized that "[l]ocal boards are in the most advantageous position to interpret and apply local ordinances. That is why '[i]n construing a zoning ordinance . . . great weight should be given to the construction placed upon the words by the local authorities.'" *Hatfield v. Bd. of Supervisors of Madison Cnty.*, 235 So. 3d 18, 21 (Miss. 2017) (second and third alterations in original) (quoting *Columbus & Greenville Ry. Co. v. Scales*, 578 So. 2d 275, 279 (Miss. 1991)). However, we are "not bound by a board's interpretation of a local ordinance if it is 'manifestly unreasonable,'" and "we will reverse in such instances." *Id.* (quoting *Scales*, 578 So. 2d at 279).

¶12.    Furthermore, as this appeal does not involve the review of a decision to zone or rezone but, rather, review of the Board's adjudicative decision to deny the Trust's application, the same standard of review that applies to appeals of administrative agency decisions applies here. *See generally Mayor and Bd. of Aldermen of Prentiss v. Jefferson Davis Cnty.*, 874 So. 2d 962, 964 (Miss. 2004) (citing *Hooks v. George Cnty.*, 748 So. 2d 678, 680 (Miss. 1999)). "As to the ordinance's application, this Court will affirm a board's zoning decision unless it is clearly 'arbitrary, capricious, discriminatory, illegal, or without [a] substantial evidentiary basis.'" *Hatfield*, 235 So. 3d at 21 (alteration in original) (quoting *Drews v. City of Hattiesburg*, 904 So. 2d 138, 140 (Miss. 2005)). When "a board's zoning decision is 'fairly debatable[,]' we will not reverse it." *Id.* (alteration in original) (quoting *Drews*, 904 So. 2d at 140). Finally, "[t]he standard of review for questions of law is de novo." *Drews*,

6

904 So. 2d at 140 (citing *Duncan v. Duncan*, 774 So. 2d 418, 419 (Miss. 2000)).

**ANALYSIS**

¶13.    Since the Board's decision was arbitrary, capricious and not supported by substantial evidence, we affirm the decision of the circuit court to reverse and render the Board's decision.  "We have defined an act as 'arbitrary' when 'it is not done according to reason or judgment, but depending on the will alone.'" *Hall v. City of Ridgeland*, 37 So. 3d 25, 36 (Miss. 2010) (quoting *Burks v. Amite Cnty. Sch. Dist.*, 708 So. 2d 1366, 1370 (Miss. 1998)).  Moreover, "'[c]apricious' has been defined as 'any act done without reason in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.'" *Id.* (quoting *Burks*, 708 So. 3d at 1370).  Additionally, "'[s]ubstantial evidence' has been defined as '"such relevant evidence as reasonable minds might accept as adequate to support a conclusion" or to put it simply, more than a "mere scintilla" of evidence.'" *Id.* (quoting *Hooks*, 748 So. 2d at 680).

¶14.    As the circuit court noted, the "decision turns on the [Board's] interpretation of the ordinance and its application to the facts in evidence."  Again, a marina is allowed as a matter of right in Zone C-4.  A marina is defined by the ordinance as "[a] boat basin, harbor or dock, with facilities for berthing and servicing boats, including bait and fishing tackle shop and eating establishments."  Hancock County, Miss., Zoning Ordinance art. II, § 203.52.  The ordinance also provides a list of prohibited uses:

Industrial, manufacturing, or *processing uses*, the sale or repair of automobiles, and the sale of commodities not customarily construed as retail shoppers items, and any other uses not complementary or customarily needed to support commercial resort areas. Uses not prohibited by this section and not identified in the Chart of Uses shall be referred to the Hancock County Planning Commission for classification.

Hancock County, Miss., Zoning Ordinance art. IV (emphasis added) (Commercial Resort District).

¶15. The Trust's application provided that it would use the marina to berth, dock and service boats and load and unload goods, material and seafood from those boats. At the Board's meetings, the Board discussed whether the Trust was engaged in seafood processing and, in concluding that the Trust was a "seafood processor," determined that the applied-for use was not allowed in Zone C-4. The Board's reasoning stemmed from its reliance on a state licensing statute providing that "[a]ny factory or person engaged in the canning, processing, freezing, drying or shipping of oysters, fish, saltwater crabs or saltwater shrimp shall be considered a seafood processor." Miss. Code Ann. § 49-15-28 (Rev. 2012).

¶16. Given the task before the Board, site-plan-application review under its local ordinances, the Board's decision to rely on a state licensing statute's definition of a seafood processor rather than the definitions within its own ordinance to determine the effect of unloading oysters and shipping them from the site was not according to reason and implies a lack of understanding and disregard for the facts and controlling definitions. *See **Hall***, 37 So. 3d at 36 (defining "capricious" (internal quotation marks omitted) (quoting ***Burks***, 708 So. 3d at 1370)); *see generally **Drews***, 904 So. 2d at 140-41 (looking to Hattiesburg's Land

8

Development Code and not elsewhere for the definition of "variance"). Whether the Trust's proposed uses would result in its classification as a seafood processor for the purposes of a state licensing statute has no bearing on whether the Trust is engaged in processing in Zone C-4.

¶17.    Simply stated, the Trust's status under Mississippi Code Section 49-15-28(2) (Rev. 2012) is irrelevant to the question of whether the Trust was processing at the site. Nothing in the record before the Board suggested that the Trust intended to do anything at the site other than unload the oysters and ship them, and no evidence indicated that the Trust intended to process raw oysters at the site.[1] Indeed, aside from the irrelevance of the Trust's status as a seafood processor, common sense dictates that persons using a marina will unload various items from boats and remove them from the marina, with such items likely often, if not mostly, including seafood catch.

¶18.    Additionally, we agree with the circuit court's analysis distinguishing processing, on one hand, and shipping, on the other, in Mississippi Code Section 49-15-28 (Rev. 2012). The

---

[1] We agree with the circuit court's discussion of the definitions of processing:

> The general meaning of processing is to change something from its original state. Encyclopedia Britannica defines "fish processing" as the "preparation of seafood and fish for human consumption." It defines "food processing" as the "operation by which raw foodstuffs are made suitable for consumption, cooking or storage." The definition of "processing" found in a simple search at dictionary.com is "to treat or prepare by some particular series of actions, as in manufacturing" while the definition of "process" at that site includes "a continuing action, operation or series of changes taking place in a definite manner."

statute concerns, among other things, "person[s] engaged in the canning, processing, freezing, drying or shipping of oysters . . . ." Miss. Code Ann. § 49-15-28(2) (Rev. 2012). The actions of processing and shipping oysters, along with every other action in the statute, are separated by the disjunctive "or," meaning that a person's engaging in any of the enumerated actions results in classification as a seafood processor. Thus, it is sufficient to come under the purview of the licensing statute and, therefore, to be considered a "seafood processor" when a person only ships, but at the same time does not process, oysters. Notwithstanding our finding of the licensing statute's inapplicability to the decision to approve the site plan, the Board also failed to consider this important distinction.

¶19. To then conclude, as the Board did, that the Trust is shipping oysters and, therefore, is necessarily a seafood processor and by that classification alone was then engaged in processing oysters at the site, as the circuit court noted, requires a "stretch of the imagination." Even accepting the Board's conclusion that the Trust was transformed into a seafood processor by shipping oysters, no evidence was before the Board indicating that the Trust's site plan involved processing oysters or processing anything else for that matter. As noted by the circuit court, "[t]he evidence presented to the Commission and the Board is quite simply that Prestige will dock boats, unload them into trucks, and drive the trucks from the property."

¶20. Moreover, the dissent's concerns with our standard of review today are misplaced. It is true that local boards, such as the Board here, are in the most advantageous position to

10

interpret and apply their own local ordinances. Maxwell Diss. Op. ¶ 36. To that end, the dissent poses a question, "So who are we to say that Hancock County did not have in mind all state-regulated seafood processors, including those unloading and shipping raw oysters, when it prohibited 'processing uses' in C-4?" Maxwell Diss. Op. ¶ 36. The answer is simple: even with our deferential standard of review, we are still tasked with determining whether the Board's interpretation was arbitrary, which we have defined as an act "not done according to reason or judgment, but depending on the will alone." *Hall*, 37 So. 3d at 36 (internal quotation marks omitted) (quoting *Burks*, 708 So. 2d at 1370).[2] The act of applying the state licensing statute's definition of a seafood processor depended on the will of the Board alone and was not done in the frame of reason or judgment and, therefore, was arbitrary.[3]

---

[2] To be clear, four separate considerations of the Trust's application occurred: once before the Commission and at three different Board hearings. No mention of Mississippi Code Section 49-15-28 (Rev. 2012) was made at the Commission's meeting, the Board's first hearing or the Board's second hearing. The licensing statute—as well as its definition of a "seafood processor"—was only brought up before the Board during its third and final meeting, further highlighting the arbitrariness of utilizing Section 49-15-28 (Rev. 2012) at the final hour to reach its decision here. Black's Law Dictionary defines a "whim," in part, as "[a] passing fancy; an impulse . . . ." *Whim*, Black's Law Dictionary (11th ed. 2019). Pulling a state licensing statute at the last minute to deny an application seems to be the epitome of "whimsical" or, in other words, capricious. *AT&T Corp. v. Miss. Dep't of Info. Tech. Servs.*, 298 So. 3d 938, 947 (Miss. 2020) ("An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." (internal quotation marks omitted) (quoting *Pub. Emps.' Ret. Sys. v. Howard*, 905 So. 2d 1279, 1284 (Miss. 2005))).

[3] If we were to accept the Board's method of interpreting local ordinances, we should also consider a hypothetical that will highlight the absurd results that would follow. Suppose a local ordinance prohibits "banking uses" within Zone Q-4. Let's further suppose

11

¶21.   Nothing was presented to the Board to establish that either the definition of a marina

or the prohibited use of processing precluded unloading and loading oysters.  Rather, all of

the evidence presented to the Board supported a conclusion that the Trust was applying for

site approval of marina.  *See generally* **City of Ocean Springs v. Psycamore, LLC**, 124 So.

3d 658, 664 (Miss. 2013) (reviewing the decision of a city planning commission to issue a

certificate of occupancy).  Here, the Board ignored the definition of marina[4] in its own

ordinance—an act we held in **Psycamore** to be "clearly arbitrary and capricious."  **Id.**[5]  The

the ordinance, unlike the case *sub judice's* reliance on a state licensing statute, gave a
definition of the term "banker" as "any person or entity engaged in the exchange of money,
extension of credit, loaning, or banking."  The local bank, to curry favor with its fishing
clientele, decides to open a po-boy stand at the marina.  The po-boy stand would simply sell
po-boys and side items.  Of course, during it's operation as a retail business, it would
certainly engage in the "exchange of money," and there might even be an "extension of
credit" to worthy customers. Under the Board's decision in our case, a similar board would
be required to deny the bank's site plan seeking to open a po-boy stand because the po-boy
stand engaged in the "exchange of cash" and the "extension of credit," with each action
falling under the definition of a "banker," and, therefore, their action in operating a po-boy
stand constitutes "banking" even though there was no proof they would engage in "banking"
at the site.  As noted above, such a result seems absurd.

[4] While we recognize, without deciding, that the Board was perhaps not bound by
Cuevas's previous admission that the site plan fit within the definition of a marina, we do
note that Cuevas did not have any concerns or issues with the site plan at the Commission
hearing and stated that the proposed uses were consistent with the definition of a marina.
Curiously, Cuevas later agreed before the Board that the proposed use fell outside of the
definition of a marina.

[5] We also note the Board's argument that, given the stated purpose of the Commercial
Resort Districts in the ordinance, "one would not want processing uses adjacent to a beach,
tourism activities and a casino."  While this argument is sound in isolation, it is difficult to
square with both the actual location of the proposed site—right next to multiple seafood
operations, including a seafood processing plant—as well as the Board's apparent decisions
to allow expansion of the same sites that may not fit the exceptions for nonconforming uses

12

transcript of the Board's meetings makes clear that the Board misunderstood the facts and failed to apply the facts to the controlling ordinance.  Therefore, we hold that the Board's decision was arbitrary and capricious, and we affirm the decision of the circuit court.

¶22.    While the arbitrary and capricious nature of the Board's decision alone warrants reversal of its decision today, for the same reasons discussed above, we further hold that the Board's decision to deny the Trust's application on the basis that the applied-for use was not a marina but, instead, seafood processing, was without a substantial evidentiary basis.  Again, a substantial evidentiary basis requires more than a mere scintilla of evidence.  *Hall*, 37 So. 3d at 36  (quoting *Hooks*, 748 So. 2d at 680).  The evidence presented to the Board in the Trust's application and the Board's meetings only indicated that the Trust was applying to operate a marina as defined by the ordinance.  At the marina, the Trust desired to unload oysters, to load them into refrigerated trucks and to ship them to Louisiana.  The Board had

---

in the ordinance.  During oral argument, the circuit court specifically recognized the purpose of the ordinance, but it noted that "this entire area that we're talking about is nothing but seafood processing, seafood related, fishing related.  There is no casino on this particular section of the land although there is one not very far down the road."

Though we do not suggest that the existence of likely prohibited uses surrounding the site would necessarily justify allowing a prohibited use, the existence of the surrounding seafood-related businesses in the area—the status of which are disputed as to whether each constitutes a permissible "grandfathered," existing nonconforming use—that do not seem to further the purpose of the ordinance or Zone C-4 would again exhibit the arbitrariness of the Board's decision.  And while the issue is not squarely before us on appeal, we note that if the Board's past practices include approving site plans or expansions of other nongrandfathered uses in the surrounding area and in Zone C-4 that it now deems prohibited, ignoring those same past approvals and expansions would indicate that the Board's decision was arbitrary and capricious. *See generally **Psycamore***, 124 So. 3d at 664.

13

no evidence before it, much less more than a mere scintilla, suggesting that the Trust would be engaged in the processing of anything. Instead, the Board focused on the Trust's intention to ship the oysters as proof that it was a seafood processor as defined by a wholly unrelated state licensing statute inapplicable to Hancock County's zoning ordinances.

¶23. Simply stated, the Board had before it no evidence that the Trust's intended use of the property constituted a prohibited processing use under the ordinance. Instead, it only heard evidence indicating that the Trust's applied-for use fell within the ordinance's own definition of a marina and, therefore, should have approved the application, since marinas are allowed as a matter of right in Zone C-4. That same definition did not contain a condition precedent that, to qualify as a marina, no unloading or loading of seafood may occur at the site. Indeed, the ordinance contains no prohibition of unloading, loading or shipping seafood. Therefore, no evidence supports the Board's conclusion that the Trust applied for a processing use rather than a marina.

¶24. Further, the dissent mentions that the Board, in the face of uncertainty of a definition for "processing uses," "addressed a very reasonable, practical question: Would the Trust have to get a seafood-processing license to conduct the proposes activity at the site?" Maxwell Diss. Op. ¶ 34. It then provides that "because that answer was yes—the Trust would have to obtain a seafood-processing license to use the property as it intended—the Board concluded the proposed use was for seafood processing, not simply a marina." Maxwell Diss. Op. ¶ 34. The necessity for a state seafood-processing license, according to the dissent,

14

provided more than a mere scintilla of evidence supporting the Board's decision. Maxwell Diss. Op. ¶ 34. We recognize the point made by the dissent, but the point itself is not supported by evidence in the record. On the contrary, a review of the record reveals that the Board at no point addressed whether the Trust would need to obtain a seafood-processing license. Additionally, even if the Board did address a similar question, an answer in the affirmative does not support a finding that the Board's decision that the Trust was going to be "processing" at the site was supported by substantial evidence.

¶25.    Again, the question when examining whether substantial evidence supports a decision also asks if there is "'such *relevant evidence* as reasonable minds might accept as adequate to support a conclusion' . . . ." *Hall*, 37 So. 3d at 36 (emphasis added) (internal quotation marks omitted) (quoting *Hooks*, 748 So. 2d at 680). Here, the answer to the question of necessity for the Trust to obtain a seafood processor license does not tend to make the Trust's proposed use more or less likely to fit within the ordinance's definition of a marina. Thus, even if the Board were to have answered the dissent's hypothetical question in the affirmative, the same answer would be entirely irrelevant to the question before the Board and, therefore, could not show that the Board's decision was supported by substantial evidence. As a result, in addition to being arbitrary and capricious, we hold that the Board's decision was also unsupported by substantial evidence.

## CONCLUSION

¶26.    Since the Board's decision was arbitrary, capricious and not supported by a substantial

evidentiary basis, we affirm the circuit court's decision to reverse and render the Board's decision to deny the Trust's application to operate a marina in Zone C-4.

¶27. **AFFIRMED.**

**BEAM AND ISHEE, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J.; KITCHENS AND KING, P.JJ., JOIN IN PART. MAXWELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J.; COLEMAN, J., JOINS IN PART.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶28. I agree with Justice Chamberlin's plurality opinion that "the Board's decision was arbitrary, capricious and not supported by a substantial evidentiary basis[.]" Pl. Op. ¶ 26. But I agree also with Justice Coleman that this Court should not give deference to a local board's interpretation of a local ordinance. Therefore, I concur in part and in result with the plurality opinion, and I join Justice Coleman's dissenting opinion in part.

**KING, P.J., JOINS THIS OPINION.**

**COLEMAN, JUSTICE, DISSENTING:**

¶29. Local ordinances are laws. *Ordinance*, Black's Law Dictionary (11th ed. 2019). Our holding in ***King v. Mississippi Military Department***, that we would cease giving deference to the executive branch when interpreting statutes, is equally applicable to the interpretation of ordinances. ***King v. Miss. Mil. Dep't***, 245 So. 3d 404, 408 (¶ 12) (Miss. 2018). I have set forth my reasoning on the issue in my dissent in ***Hatfield v. Board of Supervisors of***

16

*Madison County*, 235 So. 3d 18 (Miss. 2017). I cannot therefore agree with either opinion that we should give deference to another branch of government when interpreting ordinances.

¶30. However, as the plurality points out, after interpreting the statute, we must still determine whether the Board of Supervisors' application of the statute to the facts was arbitrary. Based on the definition of "marina" found in the Hancock County ordinances and the common understandings of the words marina and processing, I do not believe it was. For example, the definition of marina in the applicable ordinance is a "boat basin, harbor, or dock, with facilities for berthing and servicing boats . . . ." Hancock County, Miss., Zoning Ordinance art. II, § 203.52. Nothing in the definition includes commercial offloading of seafood. The ordinance-based definition of marina is, by itself, enough to conclude that the Board did not act arbitrarily in determining that the proposed seafood unloading did not belong in a marina. In addition, though, the definition of the word "process," "a systematic series of actions directed toward some end," is certainly broad enough that I would hold that the Board did not act arbitrarily when determining that unloading seafood from boats to start the process of preparing it for sale was, as a matter of fact, seafood processing. *Process*, Random House Webster's Unabridged Dictionary (2d ed. 2001).

¶31. Accordingly, and with respect, I dissent.

**GRIFFIS, J., JOINS THIS OPINION. KITCHENS AND KING, P.JJ., JOIN THIS OPINION IN PART.**

**MAXWELL, JUSTICE, DISSENTING:**

¶32. The plurality injects itself into local-level Board decisions by affirming this case.

17

Such an intrusion is improper under these facts.

¶33.    The plurality acknowledges that "[l]ocal boards are in the most advantageous position to interpret and apply local ordinances." ***Hatfield v. Bd. of Supervisors of Madison Cnty.***, 235 So. 3d 18, 21 (Miss. 2017). "That is why '[i]n construing a zoning ordinance . . . great weight should be given to the construction placed upon the words by the local authorities.'" ***Id.*** (alteration in original) (quoting ***Columbus & Greenville Ry. Co. v. Scales***, 578 So. 2d 275, 279 (Miss. 1991)). Yet the plurality gives *absolutely no weight* to the Hancock County Board of Supervisors' construction of "processing uses." Instead, the plurality agrees with the *circuit court's* distinction between processing and shipping. Pl. Op. ¶ 18. But I point out that this case is not about whether we agree or disagree with the circuit court. It is not even about whether we agree or disagree with the Board. It is about whether the Board's interpretation of its *own ordinance* was "manifestly unreasonable." ***Hatfield***, 235 So. 3d at 21.

¶34.    The plurality strongly chides the Board for "rely[ing] on a state licensing statute's definition of a seafood processor rather than the definitions within its own ordinance . . . ." Pl. Op. ¶ 16. But the problem is that the C-4 zoning ordinance *does not* define the term "processing uses." And faced with the uncertainty whether the unloading and shipping of raw oysters constituted a "processing use," the Board addressed a very reasonable, practical question: Would the Trust have to get a seafood-processing license to conduct the proposed activity at the site? And because that answer was yes—the Trust would have to obtain a

18

seafood-processing license to use the property as it intended—the Board concluded the proposed use was for seafood processing, not simply a marina. The Board didn't just make something up; it made a reasonable decision based on statutory law. So it is beyond dispute that there is more than a mere scintilla of evidence supporting this decision.

¶35. Even the circuit court went outside the local ordinances' language to overturn the Board. The circuit judge looked to the Encyclopedia Britannica and Dictionary.com. From these outside sources, the judge formed her own opinion that "fish processing" does not include oyster shipping. So it is hard for me to understand how the plurality can, on the one hand, agree with the circuit court's reliance on an outside encyclopedia definition, Pl. Op. ¶ 17 n.1, yet on the other hand, deem the Board's reliance on an outside statutory definition arbitrary, capricious, and without even a mere scintilla of evidence. Pl. Op. ¶¶ 21-22.

¶36. The plurality asserts Mississippi Code Section 49-15-28 (Rev. 2012) is irrelevant and "wholly unrelated." Pl. Op. ¶ 17, ¶ 22. But, again, "[l]ocal boards are in the most advantageous position to interpret and apply local ordinances." *Hatfield*, 235 So. 3d at 21. So who are we to say that Hancock County did not have in mind all state-regulated seafood processors, including those unloading and shipping raw oysters, when it prohibited "processing uses" in C-4?

¶37. According to the very C-4 zoning ordinance the plurality says the Board disregarded:

> The purpose of the Commercial Resort Districts is to provide suitable areas for casinos and resort uses, activities and facilities that may be constructed and/or operated in connection or conjunction therewith including but not limited to hotels, condominiums, restaurants, retail facilities, recreational vehicle parks

19

and other uses required by law or uses that may be reasonably incidental to the foregoing uses.

This district shall provide for tourist related recreational development, within those areas that possess unique scenic and recreational value, while providing for maximum conservation of the resources of the parcel.

Given this stated purpose, it was certainly reasonable for the Board to question the Trust's assertion that it was seeking use as a C-4 marina. While the plurality insists the Trust's proposed use falls under the ordinance's definition of a marina, it does not explain how the unloading and shipping of raw oysters furthers the purpose of the C-4 zoning classification, which is to promote casino, resort, recreational, and tourist activities.

¶38. The bottom line is that our standard of review requires we give great weight to the Board's broad definition of a seafood processor. And there is absolutely zero doubt that at least a scintilla of evidence supports the Board's decision. That much is crystal clear. I would refrain from stepping into a local Board decision. I would reverse the judgment of the Hancock County Circuit Court and reinstate the decision of the Hancock County Board of Supervisors.

**RANDOLPH, C.J., JOINS THIS OPINION. COLEMAN, J., JOINS THIS OPINION IN PART.**